**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Kenneth Wayne GOODWIN, Charles William Bullard and Grover Eugene Beaver, Defendants-Appellants.**

No. 79–5369.

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1980.

---

Robyn J. Hermann, Asst. Fed. Pub. Defender, Miami, Fla., for Goodwin.

Thomas G. Sherman, Miami, Fla., for Bullard.

G. David O'Leary, Miami, Fla., for Beaver.

C. Wesley G. Currier, James D. McMaster, Asst. U. S. Attys., Miami, Fla., for the U. S.

Before TUTTLE, VANCE and POLITZ, Circuit Judges.

TUTTLE, Circuit Judge:

Three defendants, Goodwin, Beaver and Bullard appeal their convictions in the federal district court. After a jury trial, the three were convicted of conspiracy to possess with intent to distribute marijuana, a violation of 21 U.S.C. § 846. Bullard and Beaver were also convicted of possession with intent to distribute marijuana, a violation of 21 U.S.C. § 841(a)(1).

## I

Criminal charges against the defendants arose from an attempt, in January 1979, to smuggle marijuana into the Federal Correctional Institute (FCI), Miami, Florida. Bullard and Goodwin were inmates at FCI. Beaver, Bullard's brother-in-law, was an Air Force sergeant stationed near FCI.

On January 8, 9, and 10, 1979 Goodwin conversed with Robert Whitcomb, a Food Service Supervisor at FCI. Whitcomb, the chief prosecution witness, testified that Goodwin then first solicited his participation in the scheme. Following the initial contacts, Whitcomb notified the authorities, and he allowed the F.B.I. to place a recording device on his person for further talks with Goodwin. A recording of one later conversation on January 11 between Goodwin and Whitcomb shows the developing plan. Whitcomb's role in this scheme was to carry the marijuana into the prison. At least by January 12, Whitcomb met with Bullard to discuss the plan. Whitcomb testified that Bullard too encouraged him to take part in the plan.

Beaver was intended to bring the marijuana to Whitcomb but no source of the marijuana was specified. Those two met outside FCI on January 16 and discussed the plan. Whitcomb testified that Beaver, too, was a willing participant from the start.

By 5 p. m. on January 18, Beaver had the marijuana, and to pass the information, he phoned Whitcomb in a call that was recorded. Later that night at about 10 p. m., Beaver phoned Whitcomb again and arranged a delivery that took place at Whitcomb's home shortly after the call.

The next morning Whitcomb carried the marijuana into FCI. He sent a guard to wake Bullard who did not know the delivery would transpire that morning. On orders from the guards, Bullard went to the kitchen area. There Bullard was arrested as he accepted the marijuana from Whitcomb. The other defendants were subsequently arrested.

The government produced substantial evidence that all three defendants participated to some degree in the smuggling of the marijuana into FCI. On the other hand, the defendants relied on claims of entrapment. Beaver and Bullard testified that prior to meeting with Whitcomb they had no intent to commit the crime and his coaxing induced their commission of the subsequent criminal acts.

From their ensuing convictions the defendants bring to this Court several claims of error.

## II

Beaver first questions on appeal the trial judge's denial of his motion for acquittal based on the defense of entrapment.

At trial, Beaver presented evidence of entrapment. He elicited testimony from a psychiatrist who testified that Beaver could not exercise self-control in conforming his conduct to lawful bounds. He sought to show with this testimony that he could be easily manipulated. Beaver testified that he did not want to participate and only because Whitcomb, the government employee and informer, "begged" him to take part in the criminal activity, did he participate in the operation. Moreover, testimony was heard at trial that showed Whitcomb might have been Beaver's source of the marijuana.

On the other hand, parts of Beaver's testimony were rebutted by Whitcomb. Whitcomb testified that Beaver did not warn him of the danger of the criminal acts and did not initially object to the planned criminal activities. Thus, there was evidence to show that Beaver willingly participated in the plan.

█ Entrapment occurs only when the criminal conduct was the product of the creative activity of law enforcement officials. *Sherman v. United States*, 356 U.S. 369, 372–73, 78 S.Ct. 819, 820–21, 2 L.Ed.2d 848 (1958). Whether a defendant was entrapped depends upon whether the defendant was predisposed to commit the crime and the extent of the government's provision of aid, incentive, and opportunity. *United States v. Bowers*, 575 F.2d 499 (5th

**698**

Cir. 1978). The rationale for the defense rests on the belief that "no one should be convicted of a crime if he was either an innocent seduced by a government agent or one whose resistance was overcome." *Pierce v. United States*, 414 F.2d 163, 165 (5th Cir. 1969).

To establish entrapment a defendant must first present evidence of a prima facie case by showing that government conduct created "a substantial risk that the offense would be committed by a person other than one ready to commit it." *Id.* at 168. Once the defendant raises the issue and presents evidence justifying a jury charge on the defense the government bears the burden of persuasion. It must prove beyond a reasonable doubt that the defendant was not entrapped. *United States v. Groessel*, 440 F.2d 602, 606 (5th Cir. 1970). If the defendant produces overwhelming evidence of entrapment, the burden of production shifts to the government. *Id.* To create an issue of fact the prosecution must then produce evidence negating entrapment, because the defendant has otherwise established entrapment as a matter of law. The government should then introduce evidence that the defendant was predisposed to commit the crime charged. *United States v. Mosley*, 496 F.2d 1012, 1014 (5th Cir. 1974). The government may prove this fact by evidence of the defendant's conduct. *See United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Once the government comes forward with sufficient evidence that the defendant was predisposed to commit the crime rather than entrapped, the case may go to the jury. *United States v. Gomez-Rojas*, 507 F.2d 1213, 1218 (5th Cir. 1975); *United States v. Oquendo*, 490 F.2d 161, 164 (5th Cir. 1974).

Beaver's defense of entrapment was properly presented to the jury. We need not decide whether his evidence of entrapment had the "overwhelming" character that was present in other cases, *Sherman v. United States*, 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) (undisputed testimony of government agent); *Hender-*

*son v. United States*, 261 F.2d 909, 912 (5th Cir. 1958) (on unrebutted testimony by defendant it was "patently clear" that defendant was induced by informers to take part in alleged criminal acts) because evidence was introduced directly conflicting with crucial parts of the evidence offered to show entrapment. Neither during his direct testimony, nor during his rebuttal testimony, did Whitcomb rebut directly Beaver's version of the facts relevant to entrapment. But on cross-examination, Whitcomb testified that he did not tell Beaver details of his personal situation designed to arouse Beaver's sympathy. For example, Whitcomb denied Beaver's allegation that he had told Beaver that he was desperate for cash. In addition, Whitcomb stated that Beaver did not, at their first meeting, originally state that he was opposed to the proposed plan. Finally, Whitcomb stated that Beaver did not warn him of the danger of the smuggling operation. The trial judge, thus, correctly denied Beaver's motion for acquittal based on this defense.

### III

Bullard also claims that the prosecutor's final argument contained factual representations that had no basis in the record.

In making his entrapment defense, Bullard relied on cross-examination testimony of Agent Scarborough who indicated that on January 18, Whitcomb had advance knowledge that the marijuana delivery would take place on the morning of the 19th:

Q: You did talk to Warden Cox?

A: Yes, I did.

Q: And what did he tell you about what Whitcomb had told him on the 18th?

A: Well, Warden Cox told me this at 5 a. m. on the morning of the 19th, and the entire episode of the preceding evening had already occurred. He said—and I will refer directly to this document—that Robert Whitcomb had told him earlier on January the 18th, that he, Whitcomb, had agreed with inmate Bullard to meet Bullard

inside the food service storeroom at 6:15 a. m. and deliver the marijuana to Bullard then and there.

I do not know when Whitcomb told this to Warden Cox.

Q: Except that it was on the 18th. Warden Cox knew from the day before?

A: Yes, Whitcomb had told him earlier on the 18th that this—

Q: You don't know what time of day?

A: No, I do not.

Bullard believed that this testimony provided a link in his proof that Whitcomb knew of the possibility of delivery before Beaver had the marijuana. Beaver stated that only at about 4 p. m. on the 18th did he have the marijuana which he claimed to find mysteriously in his mailbox. From Whitcomb's "advance knowledge" of the marijuana delivery, the defendant hoped the jury would infer that Whitcomb was either the source of the marijuana or a participant in a broader scheme to entrap the defendants.

But in his closing argument, the prosecutor contradicted this testimony:

[MR. CURRIER:] With respect to that conversation or that comment by Warden Cox to Agent Scarborough that keeps coming up and up and up, they are making hay on that, because there was confusion and a misstatement engendered early in the case. We have been trying and trying to get that straightened out, that caused all the problem, but there never was a statement by Cox that there definitely, in fact, was going to be a marijuana delivery.

The statement was that there would be a meeting the next morning between Bullard and Whitcomb.

MR. O'LEARY: Objection, your Honor. That is not so.

THE COURT: Overruled.

MR. CURRIER: And during the examination of Agent Scarborough on that point, he testified that that is exactly what it was, that the only statement was that there was a meeting and that Cox

was called; he later testified that Cox was called by Whitcomb that night after Beaver had delivered the marijuana.

MR. SHERMAN: Your Honor, there was no such testimony, and I would ask for an instruction to the jury that they remember what they remember, consider what they remember about it.

THE COURT: Well, as you see, there is a dispute about what the testimony is, and you will be the judges of where the truth lies in that matter.

Your objection is overruled.

The defendant claims that those remarks were without basis in the record and constitute reversible error under *United States v. Allen*, 588 F.2d 1100, 1108 (5th Cir. 1979); *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978); *Dugan Drug Stores, Inc. v. United States*, 326 F.2d 835, 837 (5th Cir. 1964).

A prosecutor may not, in his closing argument, inject into his argument any extrinsic or prejudicial matter that has no basis in the evidence. *United States v. Morris, supra*. But such an error did not occur in this case. Agent Scarborough's testimony was not consistent. For example, the redirect examination contradicts the cross-examination testimony about whether Cox knew about the pending marijuana delivery:

Q: What, specifically, was it that Warden Cox had related to you that he had gotten from Robert Whitcomb?

A: That Whitcomb had agreed to meet Bullard.

Q: Did Warden Cox make any statement at all at that time concerning whether or not he knew for a fact that the marijuana was going to come into the FCI that morning?

A: Not that I recall, no, sir.

Furthermore, the redirect indicates that Scarborough believed that Whitcomb first told Cox about the marijuana delivery after Beaver delivered the marijuana to Whitcomb:

THE COURT: So we can finish this, tell us, again, if you would, when the officials

at the FCI first found out about the fact that Mr. Whitcomb was going to bring the marijuana to FCI.

MR. CURRIER: Excuse me, your Honor. That is not the question I asked.

THE COURT: That is the question I am asking, if you can answer it.

THE WITNESS: During that night after the marijuana had been delivered, I believe—

THE COURT: And who told them?

THE WITNESS: I think Mr. Whitcomb.

The prosecutor did not misrepresent some of Scarborough's statements. Thus, there was no error in the prosecutor's remarks.

### IV

Defendants Bullard and Goodwin next claim error because the trial judge denied them an opportunity to examine two witnesses, Driggers and Van Zandt.

These witnesses were inmates at FCI. Driggers' testimony possibly would have assisted in establishing an entrapment defense benefiting all three defendants. Van Zandt's testimony could have aided only Bullard in establishing his entrapment defense. Testimony was heard from neither witness because the trial judge held that each witness validly asserted his Fifth Amendment right against self incrimination. All three defendants were affected to varying degrees by this action and each has standing to assert error, at least with respect to the exclusion of Driggers' testimony. Bullard, of course, would have standing to assert error in the exclusion of Van Zandt's testimony.

The alleged errors arise from the trial judge's failure to conduct hearings into the validity of the Fifth Amendment claims and his terminating all questioning once he was satisfied that the witnesses might have valid Fifth Amendment claims. When Driggers and Van Zandt claimed the Fifth Amendment privilege, the trial judge arranged for their consultation with individual legal counsel. Each counsel reported to the court that he believed his client had a valid claim. Driggers' attorney referred in a hypothetical manner to potential liability for unspecified criminal activities and other, secondary criminal liability for failure to inform the authorities of other unspecified criminal activities. Van Zandt's attorney stated without elaboration that his client feared conviction "with regard to matters directly or indirectly related to this case." Over the objection of defense counsel, the trial judge held that each witness asserted a valid Fifth Amendment claim that foreclosed all further questioning.

A defendant has a Sixth Amendment right to compulsory process to obtain favorable testimony. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). But this right does not always assure a defendant of the testimony sought. A valid assertion of the witness' Fifth Amendment rights justifies a refusal to testify despite the defendant's Sixth Amendment rights. *United States v. Lacouture*, 495 F.2d 1237 (5th Cir. 1974); *United States v. Gloria*, 494 F.2d 477 (5th Cir. 1974).

Fifth Amendment claims must be judged by the standards in *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). The *Hoffman* court stated that the Fifth Amendment privilege is applicable where the defendant has "reasonable cause to apprehend danger from a direct answer." *Id.* at 486, 71 S.Ct. at 818. And this is a question for the court to decide, the witness may not establish the privilege by his bald assertion of the privilege. Of course, the witness need not prove the danger, otherwise the privilege would be meaningless.

To sustain the privilege, it need only be evident from the implications of the questions, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence."

*Id.* at 486–87, 71 S.Ct. at 818. The privilege must be sustained if it is not " 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." *Id.* at 488, 71 S.Ct. at 819 (emphasis in original).

The trial judge must make a proper inquiry into the legitimacy and scope of the witness' assertion of his Fifth Amendment privilege. A blanket assertion of the privilege without inquiry by the court, is unacceptable. Thus, where the trial judge excused a witness without inquiry about the validity or scope of the witness' claim, this Court has reversed and remanded to the trial court for a hearing to determine whether the witness' fear of self incrimination was justified and, if so, what the boundaries of the witness' Fifth Amendment rights were in relation to the testimony sought by the defendant. *United States v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir. 1975). Similarly, where the trial court conducts an *in camera* hearing into the witness' Fifth Amendment privilege it must make "a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976). Although the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions. The witness may be totally excused only if the court finds that he could "legitimately refuse to answer essentially all relevant questions." *United States v. Gomez-Rojas, supra,* at 1220. Otherwise, "[o]nly as to genuinely threatening questions should his silence [be] sustained." *United States v. Melchor Moreno, supra,* 536 F.2d at 1049.

The convictions of all three defendants must be reversed because the trial judge allowed the two witnesses to make blanket assertions of their Fifth Amendment rights regardless of the questions to be asked by defense counsel. The trial judge erred when he excused each witness, foreclosing further questioning, after he had assured himself of the validity of each witness' claim. Even where the judge is satisfied about the validity of the Fifth Amendment claim, he must give heed to the proper scope of such a claim. A finding of such a valid claim does not normally foreclose all further questions.

From his inquiry into the basis of the Fifth Amendment claims the trial judge could not make findings that every question would tend to incriminate Driggers and Van Zandt. Allowing the counsel for these witnesses to present the claims yielded some helpful information. But that information was not sufficient to allow the judge to determine accurately the nature and scope of feared incrimination. Driggers' attorney outlined several possible bases for criminal liability that could arise from his client's testimony, but these suggestions were made more as hypothetical offerings rather than real possibilities.[1]

---

1. [MR. KANZIGER:] Well, in this case it is the defendant who is calling a witness. Well, the man is a convicted felon. He is in a Federal Correctional Institution. The same basis goes. There is the fact that if we want to be blind to the fact that many things occur in federal correctional prisons, if we want to be blind to that, we can say nothing occurs; one or two bad items occur and you get caught and you can get tried for it.

Well, many things occur in federal correctional institutions and many things could be incriminating for every single person who happens to be federally incarcerated, both federally or statewide in the prisons.

. . . . .

MR. KANZIGER: Your Honor, hypothetically during the examination, and more specifically cross examination, of a witness even for impeachment sake, things could come out in which the person could be possibly under jeopardy of Title 18, Section 2, Aiding and Abetting, not necessarily the crime that is involved in this case, but other crimes.

He could lend himself to a Section 3, an Accessory after the Fact, or a Section 4. Now, this is going to be an interesting one, misprision a felon. You can have a person misprision a felon within a prison because if he knows of it, he helps the person not come forth or let the officials within the prison know about it; he is, therefore, guarding another felon within the prison system.

Van Zandt's attorney did specify that his client feared liability arising out of matters either directly or indirectly related to this case. But such a conclusory statement could not fully inform the court of the basis or scope of Van Zandt's Fifth Amendment claim. In short, the procedure followed at trial was not adequate.

 Better results can be obtained if a trial judge conducts a hearing with the witness in his chambers out of the jury's presence. In such a hearing the witness need not reveal the details of his possible liability. But he must describe in general terms the basis of the liability actually feared. He must give a description that is at least adequate to allow the trial judge to determine whether the fear of incrimination is reasonable and, if reasonable, how far the valid privilege extends. This is to allow the trial judge to make a decision regarding the witness' obligation to answer each question as asked. A record can be made that is separate from the record kept of the proceedings in the courtroom. This record could be sealed and opened only for appellate review, if necessary. Such an *in camera* hearing in this case could have informed both the trial judge and this Court.

In its brief the government challenges the admissibility of the evidence that was sought to be provided by the two witnesses, claiming that such testimony is irrelevant or hearsay. The *Melchor Moreno* Court mentioned relevancy and materiality as a final component of a compulsory process contention. 536 F.2d at 1050.

 The defendants offered the testimony of Driggers to bolster their entrapment defenses. According to counsel's proffer, Driggers could have testified that at the time of Bullard's arrest for receiving marijuana from Whitcomb, that Whitcomb, coming out of the place of the arrest, said: "We got the wrong guy." Each defendant might have benefited from such testimony because it tended to show that Whitcomb was targeting someone for arrest rather than merely presenting an opportunity for the defendants to commit a crime. Because such testimony indicated a broader scheme

of entrapment, it was relevant. Furthermore, the statement was not hearsay because it was not offered to show the truth of Whitcomb's statement. Thus, the defendants should have had this testimony.

 The relevance of Van Zandt's testimony seemingly extends only to Bullard. Counsel for Bullard called Van Zandt to the stand. Upon Van Zandt's refusal to testify, counsel stated that the witness could have testified about Bullard's advocacy of drug counseling programs and his non-use of marijuana. From this, counsel sought to show that Bullard was unlikely to participate in a drug deal. Further, Van Zandt could have testified about Bullard's habit of wearing an ace bandage, thus supporting Bullard's claim that he always wore the bandage and did not wear it just for the occasion of smuggling marijuana. Thus, Van Zandt's testimony could also have been relevant.

For these reasons, the defendants' convictions must be reversed.

## V

Goodwin and Bullard further claim that intimidation by government officials rather than fear of self-incrimination caused the inmate-witnesses, Van Zandt and Driggers, to refuse to testify.

No formal proof of intimidation of Van Zandt or Driggers was offered at the trial. Rather the defense counsel made this claim based on their conversations with witnesses in the holding cell. Threats by prison officials were mentioned in the record by defense counsel. In the record, Bullard's attorney mentioned one threat made by the prosecutor to an unnamed witness. Goodwin asserts that this threat was made to Van Zandt. Bullard does not mention this particular threat on appeal. In addition, the attorneys for witnesses, Driggers and Van Zandt, also indicated that their clients had received such threats: one implied as much by his apparent agreement with defense counsel's claims of intimidation and the other directly stated that threats by prison officials influenced his client's deci-

sion not to testify. In addition, one other inmate-witness, who did testify fully, stated in court that he had received direct threats from prison officials conditioned upon whether he testified for the defendants.[2] The defendants requested a hearing into the alleged threats, but the requests were denied.

 These allegations raise very serious questions. Threats against witnesses are intolerable. Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant. *United States v. Henricksen*, 564 F.2d 197 (5th Cir. 1977). If such a due process violation occurs, the court must reverse without regard to prejudice to the defendants. *United States v. Hammond*, 598 F.2d 1008 (5th Cir. 1979).

 The normal time to dispose of claims of witness intimidation is at the trial. A separate evidentiary hearing is not required. Thus, this court has stated that "the question of whether prosecutorial conduct amounts to duress is one expressly deemed by the Court to be appropriately disposed of at the trial stage." *United States v. Miller*, 491 F.2d 638, 647 (5th Cir. 1974). Moreover, this Court has previously denied a defendant's request for a separate pretrial hearing regarding claims of prosecutorial misconduct in tampering with witnesses. There we stated that:

> Evidentiary issues bearing on possible prosecutorial misconduct should normally be reserved for trial . . . .. The charges of misconduct in this case all concerned alleged efforts by the prosecution to tamper with the testimony of witnesses; they presented precisely the sort of factual questions best reserved for trial. The trial court therefore acted correctly in not conducting a separate evidentiary hearing at the pretrial stage.

*United States v. Bates*, 600 F.2d 505, 511 (5th Cir. 1979). In addition to the theoretical appropriateness of the question for determination at trial, simple economy would seem to demand that these issues be dealt with at trial where the court will dispose of other, related issues.

On this appeal we now face unresolved claims of government intimidation of defense witnesses. If we were not reversing the convictions on other grounds, we would be required to remand to the district court for findings on the validity of these claims. And if proven such violations of due process would require automatic reversal. Because the cases will be tried again in any event, this procedure will not be necessary. But if witnesses called at the new trial refuse to testify because of alleged threats, the trial judge should take appropriate steps to investigate such claims.

### VI

Defendant Beaver also asserts that the trial judge erred in denying his motion for a subpoena.

Beaver had wished to call his former commanding officer, a Major Molyneaux, as a character witness. Shortly before the trial, Molyneaux was ordered to North Carolina and his commanding officer indicated to defense counsel that he could return on short notice but only if a subpoena was issued. Upon learning of this, the defense counsel on May 10, 1979, four days before trial, sought a subpoena for Molyneaux. The trial judge on the first day of the trial, denied the motion because the motion was "not timely filed" and would delay the case. Furthermore, the judge stated that the witness was not critical to the case. The judge persisted in this ruling despite the defense counsel's statement that Molyneaux could be available on short notice if a subpoena was issued.

 The right of the accused to subpoena witnesses is guaranteed by the Sixth Amendment and is a fundamental element

---

2. THE WITNESS: I was told by the Warden himself that if I appeared in court and did any type of testifying, that my time at FCI, Miami would be made harder and I would be transferred to another institution. (Testimony of Fitzgerald).

Bell, another inmate-witness testified to indirect threats.

of due process. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The government argues that the trial judge exercises his discretion in issuing a subpoena. It is true that this Court has stated that in deciding on the issuance of an individual subpoena, the trial judge exercises his sound discretion. *United States v. Hathcock*, 441 F.2d 197, 199 (5th Cir. 1971). Among the factors that the trial judge may consider is the timeliness of the motion. *United States v. Moudy*, 462 F.2d 694, 698 (5th Cir. 1972). But this discretion is subject to review on appeal because the boundaries of discretion are narrowed by the defendant's Sixth Amendment right to compulsory process. *Welsh v. United States*, 404 F.2d 414, 417 (5th Cir. 1968). Unless the government shows the request to be frivolous, the request for a subpoena to relevant evidence must be granted. *Id.* at 417–18. This Court, thus, has held that a denial of a subpoena to a material witness was reversible error despite the filing of the motion on the day before trial. *United States v. Moudy, supra*, 462 F.2d at 698. The *Moudy* court noted that, although delaying tactics should not be rewarded, the subpoena for a witness should have been issued where the testimony sought was relevant and the record did not demonstrate that the trial would have been delayed. *Id.*

█ These standards require the reversal of Beaver's conviction. Molyneaux's testimony was relevant to Beaver's case. With convincing testimony about good character, Beaver might have better established an entrapment defense by more convincingly showing his disinclination to participate in criminal activities. In addition, defense counsel argued that the "late" request of a subpoena resulted only because of the witness' sudden military transfer to North Carolina; counsel believed that absent a transfer the witness would have testified without a subpoena. The record does not indicate that the subpoena would have delayed the trial. The motion for the subpoena was made four days before the trial. The trial lasted almost three days. Had the subpoena issued either at the time when the motion was made or at the start of the trial, Beaver would have had the chance of obtaining the testimony of Molyneaux who was able to come on short notice only if a subpoena issued. Because the trial judge denied the motion, Beaver had no chance of obtaining the character witness he desired. Thus, Beaver's conviction would merit reversal for this reason even if we were not reversing on other grounds.

The defendants were all entitled to more thorough inquiries into the two witnesses' claims of the Fifth Amendment privilege. In addition, defendant Beaver was entitled to the subpoena denied him for his character witness. For the court's failure to protect the defendants' rights in these matters, we reverse the convictions and remand to the district court for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.