**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Kenneth Wayne FRICKE,
Defendant-Appellant.**

No. 80–2215.

United States Court of Appeals,
Fifth Circuit.

Aug. 25, 1982.

Jimmy Phillips, Jr., Angleton, Tex., Jack B. Zimmermann, Houston, Tex., for Fricke.

Anna E. Stool and John M. Potter, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Early on the morning of February 25, 1979, appellant Kenneth Wayne Fricke, a narcotics agent with the Texas Department of Public Safety ("DPS"), severely beat Larry Michael Hintz. The incident grew out of an altercation between the two at a dance hall called the Watering Hole, in Wallis, Texas. Fricke and two other DPS

officers, all of whom were apparently off duty following a plain clothes investigation at another location earlier in the evening, were patrons of the hall on the night in question. After a confrontation, Fricke was struck by Hintz, who fell down near a bar. Terry Joe Baldwin, a Wallis, Texas police officer, arrested the intoxicated Hintz and took him out of the dance hall, where another Wallis officer, Angel Salcido, handcuffed Hintz and placed him in a patrol car. Fricke followed Baldwin and Hintz out of the hall, and, after talking with Baldwin, told one of the other DPS officers, John Janicek, that he planned to "see what he [Hintz] was made of." Janicek asked if this was a good idea because of the "federal government." Fricke replied that Baldwin had said it was all right. Fricke then got in the car and directed Baldwin to a remote area where, in the presence of Salcido and Baldwin, Fricke proceeded to brutally beat Hintz. Afterward, Fricke told Janicek that he had "tagged" Hintz. The government also introduced evidence of an attempted cover-up of the incident.

Fricke, Baldwin, and Salcido were charged with both conspiring to violate, and violating Hintz's civil rights under 18 U.S.C. §§ 241 and 242.[1] Salcido's case was later severed and he testified as a government witness against Fricke and Baldwin. Both were convicted. Fricke appeals.

Fricke asserts five errors in his trial. Finding that they do not present reversible error, singly or collectively, we affirm his conviction. Preliminarily, we note that the evidence against Fricke was extremely strong, and was virtually uncontroverted in any of its essentials.

## I.

Fricke's first alleged error presents a familiar problem. The trial court instructed the jury as follows:

"With regard to specific intent, you are instructed that intent is a state of mind and can be proven by circumstantial evidence. Indeed, it can rarely be established by any other means. In determining whether this element of specific intent was present, you may consider all the attendant circumstances of the case.

"I charge you that *a person ordinarily is presumed to intend all the natural and probable consequences of an act knowingly done.* The burden of proof as to each element of the offense remains, however, with the Government.

"If you find that the defendants knew what they were doing and that they intended to do what they were doing, and if you find that what they did constituted a deprivation of a constitutional right, then you may conclude that the defendants acted with the specific intent to deprive the victim of that constitutional right." (Emphasis added.)

 Fricke argues that this charge acted as a conclusive presumption and thereby relieved the government of its burden of proof on one of the elements of the crime. Obviously, our en banc attempted solution

---

1. Section 241 states:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life."

Section 242 states:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life."

in this thorny area, *United States v. Chiantese*, 560 F.2d 1244 (5th Cir. 1977), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979), has not been entirely successful. Courts continue to give questionable instructions. *See, e.g., United States v. Sutton*, 636 F.2d 96, 97–98 (5th Cir. 1981). The Supreme Court has also addressed, and condemned, instructions containing conclusive presumptions. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Clearly, we are not writing on a clean slate.

In *Chiantese* we refused to adopt a *per se* rule of reversal for these types of charges. However, we also stated that when a charge included this sort of coercive or burden-shifting language we would not uphold it by harmonizing the erroneous instruction with curative statements or phrases contained elsewhere in the charge. Rather, we held that we would weigh the possible harm of the instruction in the context of each case. We do not believe *Sandstrom* warrants any change in this analysis.[2]

We begin by noting that Fricke's able and vigorous counsel failed to object to the instruction. Because the error at least approaches constitutional stature, we will assume we must determine whether it was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1976); *Mason v. Balkcom*, 669 F.2d 222 (5th Cir. 1982). We do,

however, regard the defendants' failure to object as significant. It supports a determination that specific intent was not a critical question in the case. Of course, since specific intent is an element of the crime, the prosecution must still establish its existence beyond a reasonable doubt. This burden is much easier though when the defendant presents no conflicting evidence on the issue. Fricke's defense was that no beating took place. The testimony, however, indicated that Fricke planned to strike Hintz, that Baldwin knew of this, and that Fricke did indeed beat Hintz while, as Fricke plainly knew, Hintz was intoxicated, handcuffed, and in police custody; and that the beating was made possible by the cooperation of the arresting officers, which Fricke had solicited for this purpose. Under these circumstances, if a jury concluded that a beating took place, it would undoubtedly encompass a finding that the defendant had the requisite intent. The jury's verdict necessarily reflects that a beating took place, and that it occurred while Hintz was in custody. It is plain that Fricke had the requisite specific intent. Moreover, the proof of Fricke's guilt was nearly overwhelming, and other portions of the charge render it unlikely that the jury was significantly affected by the word "presumed." The first error is rejected. The instruction was harmless beyond a reasonable doubt.[3]

---

**2.** Before beginning the analysis, we note that here the instruction is somewhat qualified. While the improper word "presumed" is used, the expression "*the law* presumes," with its especially coercive connotations, is not employed. The instruction states that "a person *ordinarily* is presumed to intend all the natural and probable consequences of an act knowingly done." However, even if we assume that a jury would not treat the presumption as conclusive, it at least may have the effect of shifting the burden to the defendant to show that this is not an ordinary situation. Both *Sandstrom* and *Chiantese* condemn these types of instructions as well. In the two sentences following the "presumed" language, the jury was instructed that the burden of proof on each element remained with the government, and, in effect, that a finding of specific intent was permissive ("you *may* conclude"), rather than mandatory. The court also charged the jury that "the law never imposes on a defendant in

a criminal case the burden or duty of calling any witnesses or producing any evidence, and no adverse inferences may be drawn from the failure to do so." We do not suggest that these portions of the instructions eliminated all error in the use of "presumed." *See United States v. Chiantese*, 560 F.2d at 1255; *cf. United States v. McRae*, 593 F.2d 700, 704–05 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979) (instructions did not use "presume"). However, these ameliorative portions of the charge, and the qualified nature of the questioned instruction, are relevant, along with the other circumstances of the case, to our assessment of whether the error was clearly harmless.

**3.** Once more, however, we urge trial courts to avoid the use of presumptive language in instructions. *See United States v. Chiantese*, 560 F.2d at 1255–56 (suggesting proper intent instructions).

## II.

Fricke's second alleged error concerns three witnesses subpoenaed by the defense, who invoked their fifth amendment privileges and refused to testify. Fricke claims the government violated his right to due process and to compulsory process by telling these witnesses, during trial, that they were the subject of an ongoing grand jury investigation into the cover-up of the beating.

"Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant." *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980). Such interference is not present in this case. The government did not inform the witnesses that they would become grand jury targets if they testified. Rather, they were *already* targets of an ongoing grand jury investigation.[4] In fact, the whole matter surfaced when one of the witnesses, Wallis Chief of Police Lee White, presented the court with a motion stating that he planned to invoke the fifth amendment. One of the other witnesses, Officer Johnny Perez of Sealy, was also planning to invoke the fifth, although he was not sure to what extent. Only Officer J. W. Johnson of Bellville was unaware that he was a target of the grand jury. In a proceeding to determine how to handle White's assertion of the fifth amendment, Fricke's counsel advised the court that, though he might change his mind, he did not anticipate calling Johnson,[5] and that Johnson had stated he had not retained counsel and was not sure whether he was going to claim the fifth amendment. The government attorney informed the court, in the presence of defense counsel, that Johnson was also a target. The court then informed Johnson and advised him to retain an attorney. The following day the court held another conference to determine the validity and scope of the witnesses' fifth amendment claims. And, as noted below, the government stipulated to the substance of what the defense apparently wanted to establish by Johnson's testimony. Under these circumstances, we refuse to find "substantial government interference" with the defendant's right to call witnesses.

Fricke has not shown that the government's investigation of these people was unjustified, nor that it was prompted by the possibility that they might testify for the defense. A defendant's sixth amendment rights do not override the fifth amendment rights of others. *United States v. Lacouture*, 495 F.2d 1237 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974). Neither can a defendant compel the government to grant use immunity to witnesses he desires to call. *See, e.g., United States v. Chagra*, 669 F.2d 241, 258–61 (5th Cir. 1982). Given this, we do not feel that a defendant's rights are violated when the government merely informs witnesses that they are targets of an investigation, as long as the investigation was not prompted by the possibility of the witnesses testifying, *cf. United States v. Hammond*, 598 F.2d 1008, 1012–14 (5th Cir. 1979), and the government does not harass or threaten the witnesses, *see United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976).[6]

## III.

Fricke presents another alleged error relating to the three witnesses dis-

---

4. It is true that the investigation was of recent origin. But this was caused by Salcido's decision to testify. His information convinced the government that the three witnesses might have tried to both cover up the beating and frustrate the investigation.

5. Counsel had also earlier advised the court, "I do not think at this time I will use [Johnson]."

6. The effect of accepting Fricke's argument would be to ensure that defendants receive the testimony of witnesses who are blissfully ignorant of their potential criminal liabilities. We doubt that many such witnesses exist, especial-

ly with valid fifth amendment rights, and we refuse to condemn the government if it effectively prevents these lambs from being led to slaughter. This is not to say that we wholeheartedly accept the government's assertions of the pristine nature of its motivations. The government does not usually follow about those it is investigating, reminding them of their fifth amendment rights. We simply hold that we find no governmental threat or other misconduct under the circumstances of this case.

cussed above. His claim here has two components. In determining the scope and validity of the fifth amendment claims of witnesses White, Perez, and Johnson, the trial judge held a hearing out of the presence of the jury. Defense counsel, and counsel for the potential witnesses, were furnished copies of the respective witness' grand jury testimony. The trial judge elicited what questions the defense planned to ask each witness, and then, in a general way, inquired whether the witnesses would assert the fifth amendment and on what basis. The judge next excluded the Assistant United States Attorney and the defendants and their counsel, and made a slightly more specific inquiry of each individual witness concerning his fifth amendment claim, with only the witness' counsel present. The court ruled that any relevant question could have a tendency to incriminate these witnesses. Since each planned to assert the fifth, the court would not allow the defense to call the witnesses to the stand.[7] The court sealed the record of this inquiry. *See United States v. Goodwin*, 625 F.2d at 702 (suggesting this approach).

Fricke asserts that excluding his lawyer from part of this proceeding violated his rights to due process, compulsory process, and effective assistance of counsel. In conjunction with this, because he has not had access to the sealed record, Fricke also urges this Court to carefully evaluate the trial court's determination of the scope and validity of the witnesses' fifth amendment claims. We have done so.

This is an extremely complex area, with tensions existing between the rights of witnesses, the rights of defendants, and the policy against closed judicial proceedings. *See United States v. Melchor Moreno*, 536 F.2d 1042, 1047–48 n. 7 (5th Cir. 1976). We feel the trial court handled the matter in an acceptable fashion under the circumstances. In *Melchor Moreno* we noted that the complexity of the subject matter may make suitable the participation of defense counsel in an *in camera* inquiry. *Id.* But a significant portion of the reasoning behind this possibility is the desire to prevent overburdening the trial judge. In this case, the trial court had the benefit of the views of defense and government counsel in the initial portion of the in-chambers hearing. The subject matter was not so complex that additional help from defense counsel was necessary. Further, Fricke has not cited any cases indicating that a defendant can examine a witness in open court to determine the legitimacy of his fifth amendment claim. We see no reason for a different result when the inquiry is made *in camera.* *See id.* at 1048 n. 7. It is for the judge to determine the validity of fifth amendment claims. Subjecting a witness to an examination by a partisan party might effectively destroy the privilege. Nevertheless, we do not hold that it is always proper to exclude defense counsel from these *in camera* hearings. Even if his participation is primarily passive, counsel's presence can be important in preserving, or preventing, an error by the court. However, a reciprocity problem is present. The value of an *in camera* inquiry is that it allows the court to probe the witness' fifth amendment claim more deeply than it could in open court. A witness' rights are threatened if this is done in the presence of the government's attorney. Yet, if the court allows defense counsel to remain present, fairness suggests that the government's interest be represented as well. We need not resolve this issue here. The record does not indicate that Fricke's counsel at any time expressed a desire to remain present during the inquiry or *ever* objected to the inquiry being conducted in his or Fricke's absence. In fact, it suggests

---

**7.** We have held that once the trial judge has correctly determined that a witness' claim of the privilege against self-incrimination protects the witness from being required to testify respecting the entire subject matter about which defense counsel desires to interrogate the witness, the defense has no right to put the witness on the stand merely to enable the jury to observe the witness claim the privilege. *United States v. Melchor Moreno*, 536 F.2d 1042, 1046 n. 4 (5th Cir. 1976); *United States v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Lacouture*, 495 F.2d at 1240.

that he led the court to believe that he was in agreement with the procedure followed.[8] Under these circumstances, we find no error in the trial court's procedure.

■ We also find that the trial court's holding that the witnesses had valid fifth amendment claims extending to all relevant questions was proper. In reviewing this decision, we are diffident because of the trial court's proximity to and familiarity with the case. *United States v. Melchor Moreno*, 536 F.2d at 1050. Of course, the trial court's discretion is not unlimited. *Id.* In this case, the court determined that the "slippery nature" of the potential charges—conspiracy and obstruction of justice—made all relevant questions potentially incriminating of these witnesses.

The witnesses' attorneys all argued that simply placing the witnesses at certain scenes could be incriminating. This is certainly true of witnesses White and Perez. White may have been involved in what the government asserts was a meeting to plan the cover-up of the beating. Perez's involvement was even more immediate. His testimony might have placed him at a cafe with Fricke immediately after the beating, and would also have disclosed Perez's role in cleaning up Hintz before Baldwin and Salcido transported him to jail in Bellville, Texas. Thus, the questions Fricke desired to ask these witnesses could easily have produced incriminating testimony. Johnson's fifth amendment claim is less clear, but given that Fricke's counsel was ambivalent about whether he would call Johnson, and that the government stipulated that Johnson directed Baldwin and Salcido to the Bellville Hospital, which is the testimony

Fricke apparently desired, we do not feel that Fricke was harmed by the court's not allowing Johnson to be called. Further, each of these witnesses had testified before the grand jury, and it appeared, as the witnesses' counsel all urged, that the testimony which the defense expected to elicit from them would at least partially conflict with their grand jury testimony, exposing them to charges of perjury.

■ We emphasize that a court must not accept, without inquiry, witnesses' blanket fifth amendment assertions. Here, the judge did not do so. He determined what questions the defendant wanted to ask and why the witnesses' claims extended to these questions. He did not err in concluding that the witnesses should not be called. *See United States v. Lacouture, supra.*

### IV.

Fricke's next alleged error is that the following jury argument by the government infringed his fifth amendment right not to testify:

"In fact, did you notice when Mr. Phillips was arguing to you, not one time did he talk about what happened when that patrol car left the Watering Hole and turned left on FM 1093, not one time. He talked about what happened inside the Watering Hole, and he talked about what happened—I think he wanted to talk about what happened in Mason's Corner Cafe, even though he kept calling it the Watering Hole. I think he meant Mason's Corner when they were sitting around having coffee. He just skipped the whole part that is the subject matter of this indictment, the whole reason we

---

8. The first potential witness examined by the court was Perez. At the initial proceedings in the presence of all parties and counsel, counsel for defendants stated what they expected to ask Perez and establish by his testimony, and the court by questioning Perez ascertained that he would claim his fifth amendment privilege because he felt his answers might incriminate him. This was substantiated by Perez's lawyer. Counsel for Baldwin, Fricke's co-defendant, then stated: "Excuse me, if I may make a suggestion.... I have no objection to leaving your office at this time with my client to let the Court inquire privately with Mr. Perez and his attorney and that portion of the record sealed. I have no objections to that." Fricke's counsel said nothing. The court did not immediately respond, but very shortly thereafter stated its intention to examine Perez in the presence only of his counsel, and to seal the record. The court then said, "So, *if nobody has any objections* to that proceedings [*sic*], I now excuse everyone except Mr. Perez and his attorney, Mr. Szekely." (Emphasis added.) The only response of Fricke's counsel was, "Your Honor, may I leave my briefcase?"

are here. *Now, he asked you to find Mr. Fricke not guilty, but not once, not once in this trial have they claimed innocence."* (Emphasis added.)

■ We must determine if these remarks were "manifestly intended or of such character that a jury would naturally take them to be a comment on the failure of the accused to testify." *United States v. Walker*, 559 F.2d 365, 369 (5th Cir. 1977). The government argues that the prosecutor was referring to Fricke's trial counsel, Mr. Phillips. Appellant counters by noting that the comment is in the plural, and refers to the "entire trial," not just final argument.

■ The statement was made after the respective lawyers for Fricke and Baldwin had each presented closing arguments. Therefore, it is certainly plausible that the "they" the prosecutor was referring to were the co-defendants' lawyers. Further, the context of the comment was an attack on defense counsel's closing argument, which emphasized inconsistencies in the testimony, but did not concentrate on Fricke's innocence. This posture was consistent with Fricke's defense strategy throughout the trial. Therefore, while it is a close question, we do not feel that the prosecution "manifestly intended" to comment on Fricke's failure to testify. The second prong of our inquiry—whether the jury would naturally consider the statement as a comment on Fricke's silence—strengthens our conviction that this is a proper conclusion. Fricke's counsel objected to the statement, and the trial judge immediately responded that the comment was directed toward Phillips' jury argument, was not a comment on the defendants' failure to testify, that defendants did not have to testify, and that he would so charge the jury.[9] Given this spontaneous interpretation by the trial judge, we hold that the jury would not naturally consider the statement as a comment on Fricke's failure to testify. No reversible error is presented. *United States v. Walker*, 559 F.2d at 369.

### V.

■ Fricke's final alleged error concerns the trial court's refusal to allow him to call Assistant United States Attorney Carl Walker to the stand. The court found that Fricke had failed to comply with certain federal regulations, 28 C.F.R. §§ 16.-21–16.26, which require the prior approval of the Attorney General or an appropriate Justice Department official before a Justice Department employee may disclose information obtained as a part of the performance of official duties.

We decline to reach the constitutionality of these regulations as applied in this case. Nor do we base a decision on whether the trial court properly determined that the regulations applied to the information sought by Fricke. Fricke desired Walker to testify regarding whether Fricke appeared before a grand jury at a certain time. Another witness claimed Fricke was at a meeting on that day and that the beating was discussed then. However, Fricke's counsel, after talking with Walker, stated to the court that Walker had informed him that he did not remember where Fricke was on the date in question. The prosecutor stated that this was her understanding of Walker's memory as well. The desired testimony was indecisive, nonexculpatory, and concerned an occurrence long *after* the beating. Given this, and that Fricke made absolutely no effort to comply with the regulations, and did not seek a recess or continuance to have more time to do so, we find that no reversible error occurred.

AFFIRMED.

---

9. In his final instructions the court carefully instructed the jury that the law did not require defendants to testify and that "no inference of any kind may be drawn, from the failure of the defendants to testify."