985 F.2d 562
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Nicholas MEDVECKY, Jr., Defendant-Appellant.
 No. 91-1029.
 United States Court of Appeals, Sixth Circuit.
 Jan. 22, 1993.
 
 Before KENNEDY and NATHANIEL R. JONES, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Nicholas Medvecky, Jr. appeals his conviction and sentence. For the reasons that follow, we AFFIRM his conviction and sentence.
 
 I.
 
 2
 On January 20, 1989, Medvecky and twenty co-defendants were indicted on a charge of conspiracy to possess cocaine with the intent to distribute and conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (1988) and 21 U.S.C. § 846 (1988). Medvecky was also charged with aiding and abetting the crime of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (1988).
 
 
 3
 In February 1989, a United States magistrate judge was presented with an application for a search warrant and a supporting affidavit. The affidavit described Medvecky's drug trafficking activities from 1984 through 1987 and was based on information supplied by three informants. Those informants, through the affiant, informed the magistrate of the following: Medvecky bought and sold large quantities of cocaine from late-1984 to mid-1987; he sold three to four kilograms of cocaine weekly to one informant's organization in 1985; he used his residence as a base for his cocaine trafficking operation; he operated his cocaine operation from both his former home and apartment where he was living in 1989; all three informants dealt directly with Medvecky at one or both of those locations; and one informant saw approximately $500,000 in cash in Medvecky's apartment on one occasion. Furthermore, the reliability of the informants was demonstrated in the affidavit, and the affiant testified that he had a considerable amount of training and experience in drug investigations. Based on that experience, and the facts of the case, the affiant concluded that, at the time of the application, indicia of drug trafficking would be found at Medvecky's residence.
 
 
 4
 On February 11, 1989, a search warrant, issued by the magistrate based on the information contained in the affidavit, was executed at Medvecky's residence. Items found by the police included the phone numbers of his co-conspirators, electronic sales, financial and tax records, weapons and a large amount of cash.
 
 
 5
 On November 6, 1989, trial commenced against Medvecky and five co-defendants in the Eastern District of Michigan. Soon after the trial commenced, the court granted Medvecky's motion for severance.
 
 
 6
 On November 22, 1989, Medvecky was charged in a superseding indictment with conspiracy to possess cocaine with intent to distribute and conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. He was also charged with one count of possession with intent to distribute cocaine and three counts of distribution of cocaine, all in violation of 21 U.S.C. § 841(a)(1). Trial was scheduled for December 4, 1989; however, Medvecky did not appear for trial on that date. Trial eventually occurred on this indictment on August 27, 1990. The jury returned verdicts of guilty on the conspiracy charge and the three distribution counts on September 11, 1990.
 
 
 7
 On October 16, 1990, Medvecky pled guilty to a charge of failure to appear for trial on December 4, 1989, in violation of 18 U.S.C. § 3146 (1988). On December 11, 1990, Medvecky was sentenced to a 281-month term of imprisonment on the conspiracy count; concurrent fifteen-year terms on his convictions for the distribution of cocaine; and a twelve-month consecutive term on his conviction for failure to appear for trial.
 
 
 8
 The evidence presented against Medvecky at trial consisted primarily of the testimony of fellow drug dealers with whom he dealt directly and drug couriers who delivered cocaine and picked up money from him. These witnesses described various transactions that took place from 1984 to 1987. In addition to testimonial evidence, evidence seized pursuant to the search warrant was introduced.
 
 The evidence showed the following:
 
 9
 A cocaine trafficking relationship between Arthur Abrams and Lawrence Genoa began developing in the early 1980s. During the latter part of 1984 and into 1985, Genoa was supplying Abrams with cocaine. Around February 1985, Genoa changed his role from that of a drug supplier to financier. In so doing, he referred Abrams to Daniel Chont and Medvecky, both of whom were to supply Abrams with cocaine. Robert Szymanski corroborated Abrams' testimony about this transitional stage in the Genoa organization. Abrams and Szymanski, who were taken by Genoa, went to Medvecky's residence on Casper Street in Detroit to obtain cocaine which they then distributed.
 
 
 10
 Daniel Chont also dealt with Genoa. Chont testified that, when Genoa made the move from being direct supplier to financier, Genoa introduced Chont to Medvecky and urged them to deal with each other. Shortly after the introduction, Chont sold Medvecky a kilogram of cocaine; however, there were no further transactions between the two because Medvecky was upset with Chont because he had diluted the strength of the cocaine. Nevertheless, when Chont and Medvecky met some time later, Medvecky suggested that they do business again.
 
 
 11
 After a time, Genoa became dissatisfied with this arrangement involving Chont and Medvecky, such that he struck a deal with Abrams whereby Genoa gave Abrams his source of supply, his customers, and a loan in return for a commission from Abrams. Consequently, customers like Szymanski were then directed to Abrams. Medvecky also became one of the persons whom Abrams supplied.
 
 
 12
 People who worked for Abrams also dealt directly with Medvecky. Brian Daly recalled an incident during the winter of 1985-86 when he delivered a half-kilogram of cocaine to Medvecky at his jewelry business, and, at the same time, picked up a large quantity of cash from him. Daly also witnessed Medvecky delivering one to three kilograms of cocaine to Abrams at his house.
 
 
 13
 Lisa Annis, another Abrams employee, went to Medvecky's apartment in the Millender Center to pick up over $20,000 in cash in payment for a kilogram of cocaine that Medvecky had received earlier that day. Her visit to Medvecky at his Millender Center apartment was memorialized in the guest register for that apartment building for February 17, 1987, which bears her signature.
 
 
 14
 Although Szymanski was supplied primarily by Abrams from 1985 to 1987, he also bought cocaine from Genoa and Medvecky. On four occasions he obtained cocaine from Medvecky. These purchases, involving various quantities of cocaine, took place at various locations including Medvecky's apartment in the Millender Center.
 
 
 15
 Abrams' drug trafficking activities continued until December 7, 1989 when cocaine was discovered during a search of his house and he was arrested.
 
 
 16
 Medvecky also had an illegal business relationship with James Bailey ("J. Bailey"), Sherrie Bailey ("S. Bailey"), and Braxton Crenshaw. Crenshaw and S. Bailey both testified at trial and identified Medvecky as the person who supplied them with large amounts of cocaine. S. Bailey, who had been married to J. Bailey, a drug dealer, kept track of the records and money of their business. S. Bailey accompanied her husband when he went to Medvecky's home on Casper Street (where he lived before he moved to the Millender Center) to pick up cocaine. From June to December 1984, the Baileys received four-ounce amounts from Medvecky two to three times a week.
 
 
 17
 At the end of 1984, the amount of cocaine which Medvecky was able to supply the Baileys increased dramatically. During most of 1985, Medvecky was supplying the Baileys with about three kilograms of cocaine a week. From the fall of 1985 to late 1986, Medvecky did not supply them with cocaine. When the Baileys resumed their activity with Medvecky in late 1986, he was supplying them with cocaine in pound and half-pound quantities. The transactions took place at Medvecky's jewelry store or his apartment in the Millender Center.
 
 
 18
 Crenshaw confirmed that the cocaine he and his brother, J. Bailey, sold came from Medvecky. Although J. Bailey usually dealt directly with Medvecky, Crenshaw obtained his cocaine directly from Medvecky when J. Bailey was out of town. In the fall of 1985, Medvecky delivered kilograms of cocaine to the Crenshaw/Bailey residence.
 
 II.
 
 19
 Medvecky first argues that evidence seized pursuant to a search warrant issued to search his apartment should have been suppressed. Medvecky argues that a magistrate should not have believed that the application for the warrant, issued in 1989, was supported by probable cause because the affidavit did not detail any drug activity after April 1987. Furthermore, he argues that the facts alleged in the affidavit were so dated that no reasonable officer could have believed that the affidavit established probable cause to search his home. As a result, he argues that the good faith exception to Fourth Amendment searches is not available to the searching officers. Finally, Medvecky maintains that the district court's failure to suppress the evidence resulting from the search, if error, was not harmless.
 
 
 20
 To determine whether a search warrant is supported by probable cause, a magistrate must use a flexible totality-of-the-circumstances standard. Illinois v. Gates, 462 U.S. 213, 233 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." Id. at 238-39.
 
 
 21
 Pursuant to the good faith exception, a police officer may rely on a warrant issued by a magistrate if that reliance is objectively reasonable. United States v. Leon, 468 U.S. 897, 919-21 (1984). The objective standard requires officers to have reasonable knowledge of what the law prohibits. Id. at 919 n. 20. The rationale behind the good faith exception is that the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges. Id. at 916. Furthermore, "penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921.
 
 
 22
 Courts have held that while there may be a significant passage of time since the last reported criminal activity, it may be properly inferred that indicia of criminal activity will be kept for some period of time. See United States v. Greany, 929 F.2d 523, 525 (9th Cir.1991) (search warrant upheld despite the passage of one and a half to two years since the last reported criminal activity in the affidavit because "equipment acquired to accomplish the crime and records of the criminal activity will be kept for some period of time"); United States v. Craig, 861 F.2d 818, 822 (5th Cir.1988) ("if the information of the affidavit shows a long-standing, ongoing pattern of criminal activity, even if fairly long periods of time have lapsed between the information and the issuance of the warrant, the information need not be regarded as stale") (quoting United States v. Webster, 734 F.2d 1048, 1056 (5th Cir.), cert. denied, 469 U.S. 1073 (1984)); United States v. LaMorte, 744 F.Supp. 573, 575 (S.D.N.Y.1990) (search warrant valid despite three-and-a-half-year lapse between the last reported act and the issuance of the warrant).
 
 
 23
 For the purposes of Medvecky's present challenge, a magistrate may have reasonably found and a trained officer may have reasonably believed that the warrant in this case was supported by probable cause. While there was a time lapse of over two years between the last reported activity and the issuance of the warrant, the particularly large volume of drug trafficking makes it probable that Medvecky would retain records, documentation and other drug paraphernalia in his apartment long after the last reported act. See Craig, 861 F.2d at 822; LaMorte, 744 F.Supp. at 575. The information in the warrant application and the warrant detail that Medvecky bought and sold large quantities of cocaine from late-1984 to mid-1987; that he sold three to four kilograms of cocaine weekly to one informant; that he used the residence which was searched as a base for his drug trafficking operation; and that Medvecky had approximately $500,000 in cash at his apartment on one occasion. Under these facts, the magistrate's finding of probable cause was warranted. In addition, the searching officers are entitled to the good faith exception because their reliance on the warrant was reasonable even though it contained dated information. Leon, 468 U.S. at 921.
 
 
 24
 Because the evidence is admissible, we do not consider Medvecky's other arguments regarding suppression of the evidence.
 
 III.
 
 25
 Medvecky next argues that the prosecution intimidated Sheldon Halpern, a crucial defense witness, from testifying. Medvecky alleges that the prosecution made Halpern afraid to testify by threatening to make him a target of an ongoing drug conspiracy investigation. Medvecky planned to call Halpern as a defense witness so that he could discredit the testimony of S. Bailey, a key government witness. While S. Bailey was testifying for the government, she disclosed information which tended to implicate Halpern as a member of the drug conspiracy. After Bailey's testimony, Halpern decided not to testify and, if called, would have envoked his Fifth Amendment right against self-incrimination. In subsequent hearings concerning Halpern's decision not to testify, the government implied that Halpern might have been involved in the conspiracy and that, if he testified, he would be asked about his involvement.
 
 
 26
 Circumstances of prosecutorial misconduct will warrant reversal if the conduct interfered substantially with a witness' "free and unhampered choice" to testify. United States v. Goodwin, 625 F.2d 693, 703 (5th Cir.1980). The existence of "substantial interference" is a factual question, and as such is reviewed by this court under a clearly erroneous standard. United States v. Pinto, 850 F.2d 927, 932 (2d Cir.), cert. denied, 488 U.S. 867, 932 (1988).
 
 
 27
 While certain types of intimidation can violate a defendant's Fifth Amendment due process rights and his or her Sixth Amendment right to compulsory process, see id.; United States v. Morrison, 535 F.2d 223, 228 (3d Cir.1976), merely warning potential defense witnesses that they are targets of investigation, or that there might be adverse consequences of testifying ordinarily does not violate a defendant's Fifth or Sixth Amendment rights. See United States v. Touw, 769 F.2d 571, 573 (9th Cir.1985); United States v. Fricke, 684 F.2d 1126, 1130 (5th Cir.1982), cert. denied, 460 U.S. 1011 (1983) (defendant's rights not violated unless an investigation was prompted by the possibility that a witness would testify or the government harassed or threatened the witness); United States v. Vargas-Rios, 607 F.2d 831, 837-38 (9th Cir.1979). To find a violation of a defendant's rights, there must be a causal connection between the alleged intimidation and the witness' decision not to testify. See Morrison, 535 F.2d at 228.
 
 
 28
 In this case, there is no causal relationship between the government's statement that Halpern might be connected to the conspiracy and Halpern's decision to assert his Fifth Amendment right against self-incrimination. In fact, Halpern's decision not to testify came before the government's statement. Furthermore, we find no intimidation by the prosecution. The prosecutor merely warned the defendant's counsel, Halpern's lawyer, and the court that it would ask potentially incriminating questions if Halpern testified. Medvecky's argument is without merit.
 
 IV.
 
 29
 Medvecky's next argument is that he was penalized for going to trial. To bolster this claim, he alleges that his sentence was harsher than those of many of his co-conspirators who pled guilty. While a defendant may not be penalized for going to trial, "[m]ere disparity in sentences is insufficient to show that the sentencing court penalized [a defendant] for going to trial." United States v. Frost, 914 F.2d 756, 774 (6th Cir.1990). Furthermore, the government has a right to encourage guilty pleas by offering substantial benefits to those who plead guilty. As a result, where a defendant has the opportunity to bargain and chooses instead to go to trial, he cannot complain. See United States v. Chase, 838 F.2d 743, 751 (5th Cir.), cert. denied, 486 U.S. 1035 (1988).
 
 
 30
 While some of Medvecky's co-defendants received substantially lower sentences than he did, he has not presented any evidence that the trial court penalized him for going to trial other than the disparity in sentences. Because the evidence presented is insufficient to show that Medvecky was penalized for going to trial, we find this argument to be without merit.
 
 V.
 
 31
 Medvecky next challenges the imposition of his sentence under the United States Sentencing Guidelines ("guidelines"). He claims that the guidelines are inapplicable to him because he was no longer a participating member of the conspiracy after November 1, 1987, the effective date of the guidelines.
 
 
 32
 In reviewing factual findings of a sentencing court under the guidelines, we accept the findings of fact unless they are clearly erroneous. 18 U.S.C. § 3742(e) (1988); United States v. Duque, 883 F.2d 43, 44-45 (6th Cir.1989).
 
 
 33
 Even if a defendant did not participate in the conspiracy after the effective date of the guidelines, the size of a drug conspiracy may make it foreseeable that the conspiracy would continue after the effective date. United States v. Walton, 908 F.2d 1289, 1300 (6th Cir.1990), cert. denied, 111 S.Ct. 273, 530, 532 (1990). "In order to escape liability for the acts committed after the effective date of the guidelines, the defendants must prove that they affirmatively withdrew from the conspiracy before the effective date." Id. Withdrawal is established by affirmative action "to defeat or disavow the purpose of the conspiracy." United States v. Lash, 937 F.2d 1077, 1083 (6th Cir), cert. denied, 112 S.Ct. 397 (1991) and 112 S.Ct. 943 (1992). Simply ceasing to participate does not constitute withdrawal. Id.
 
 
 34
 Turning to this case, the size of the drug distribution conspiracy, both in quantity and participants, makes it foreseeable that the conspiracy would continue after the effective date of the guidelines. Furthermore, there was testimony that Abrams continued the conspiracy well into 1989. Last, Medvecky has not demonstrated that he affirmatively withdrew from the conspiracy. As a result, the guidelines are applicable to his sentence.
 
 VI.
 
 35
 Medvecky argues next that he should be resentenced under United States v. Davern, 937 F.2d 1041, 1051 (6th Cir.1991) (Davern I ), vacated, 970 F.2d 1490 (6th Cir.1992) (Davern II ). The majority of the court in Davern I held that the sentencing court must determine whether the Sentencing Commission took into account all of the aggravating and mitigating circumstances of a defendant's case before sentencing that defendant. Id. at 1046. The court held that the district court must follow the sentencing process established by Congress in 18 U.S.C. § 3553(a) and (b) (1988). Id. at 1051. The court stated:
 
 
 36
 [t]his process provides for a mandatory guidelines sentence at a particular level if, but only if, in specifying the offense level to be applied the Commission took into account all of the aggravating and mitigating circumstances in the case. If there is such a circumstance not taken into account, then there is not one right answer under the Guidelines. In such a case the District Court 'shall impose an appropriate sentence having due regard' for the Guidelines.
 
 
 37
 Id. Because the court did not believe that the Commission had taken into account the circumstances in this case, it reversed and remanded the case for resentencing under the more flexible procedure articulated above. Id. The Sixth Circuit, sitting en banc, vacated the panel's decision and affirmed the district court's ruling in Davern. Davern II, 970 F.2d at 1492. The court held that a guideline sentence is mandatory and that departure is justified only if there is an aggravating or mitigating circumstance that was not taken into account in setting the Guideline sentence. Id. at 1492-93. The court held that it is incorrect, and impossible, to determine whether the Sentencing Commission took into account all of the aggravating and mitigating circumstances of a defendant's case before sentencing that defendant. Id. at 1493.
 
 
 38
 Because the sentencing court in Medvecky's case determined his sentence in accordance with the Davern II rationale, Medvecky's request for resentencing is without merit.
 
 VII.
 
 39
 Medvecky next argues that the district court erred by considering the amount of cocaine sold by Medvecky to co-defendants S. and J. Bailey and Crenshaw in computing his base offense level. The guidelines allow a defendant's base offense level to be computed upon whatever quantity of drugs the government can prove, by a preponderance of the evidence, was associated with a defendant and was part of the same course of conduct as the offense of conviction. United States v. Miller, 910 F.2d 1321, 1326-27 (6th Cir.1990), cert. denied, 111 S.Ct. 980 (1991); United States v. Sailes, 872 F.2d 735, 737-39 (6th Cir.1989). In addition, factual findings of the district court are not rejected unless clearly erroneous. United States v. Christoph, 904 F.2d 1036, 1040-41 (6th Cir.1990), cert. denied, 111 S.Ct. 713 (1991).
 
 
 40
 Although the Baileys and Crenshaw were not members of the conspiracy charged in the indictment, Medvecky was selling cocaine to the Baileys and Crenshaw during the same time period that the conspiracy, as charged, was operating. Furthermore, the nature of the contraband and the locus of his activities were the same. Based on those facts, it was not clear error for the district court to consider the drugs sold to the Baileys and Crenshaw as being in the same course of conduct.
 
 VIII.
 
 41
 For the foregoing reasons, Medvecky's conviction and sentence are AFFIRMED.