**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph Lee LaCHANCE, Sonia Luz
Meza-de Cepeda, and John Thomas
Bowles, Defendants-Appellants.**

No. 86–3070.

United States Court of Appeals,
Eleventh Circuit.

June 1, 1987.

Joseph Ficarrotta, Bennie Lazzara, Jr., Tampa, Fla., for LaChance and Meza-de-Cepeda.

Robert T. Kennedy, Asst. U.S. Atty., Tampa, Fla., Mervyn Hamburg, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Tom McCoun, St. Petersburg, Fla., for Bowles.

Before TJOFLAT and VANCE, Circuit Judges, and ATKINS *, Senior District Judge.

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

ATKINS, Senior District Judge:

Appellants LaChance, Cepeda and Bowles appeal their convictions for conspiracy to import controlled substances and related offenses. They were indicted with fifteen co-defendants in a thirteen count indictment which focused upon the criminal activities of Albert Fortna.[1]

None of the appellants was charged with substantive offenses. LaChance and Cepeda were charged in Count II only, for conspiracy to import marijuana into the United States. Bowles was charged in Count II and III only, for the importation conspiracy and conspiracy to possess marijuana with intent to distribute it, respectively. They seek reversal on grounds that the evidence was insufficient to support the verdicts, and that the district court erred in denying their motions for severance, in admitting certain evidence, and in refusing to permit hybrid representation during closing argument. We find no error and affirm.

## I. SUFFICIENCY OF THE EVIDENCE

Cepeda and Bowles challenge their convictions for conspiracy to import marijuana into the United States on the ground that the evidence was insufficient to support the verdicts.

### A. Cepeda's Involvement

■ Cepeda argues that the record shows only isolated contacts between her and members of the conspiracy, during which she was merely present and did not participate in the conspiracy. However, the evidence adduced at trial, when examined in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), supports a finding that Cepeda was not a mere bystander, but was in fact a participant in the conspiracy.

There was testimony from which the jury could find that in November 1982 Cepeda attended a conspiratorial planning meeting in Tampa and participated in the discussions at that meeting; that Cepeda and Rivas, her husband, were jointly responsible for furnishing the 22,000 pounds of marijuana that formed the subject matter of the illicit agreement; that in May 1981, Cepeda attended another meeting in Tampa wherein Rivas, Fortna, LaChance and co-conspirator Martinez reviewed the importation plans; and that the next day Cepeda accompanied Rivas and Martinez on a flight to San Antonio.

Further testimony indicated that Cepeda was a contact for members of the conspiracy. Fortna called a woman named "Sonia" for information regarding a flight to Aruba and the crew's abandonment of the plane there. Martinez characterized Cepeda as "the contact in Colombia to purchase the marijuana," and co-conspirator Kelly described Cepeda's family in Colombia as the source for the marijuana.

Kelly further testified that Cepeda "was financing the operation," that she provided $40,000.00 to lease a replacement aircraft, and that, together with Rivas, she was entitled to half the marijuana load. Cepeda attended two meetings in Miami when Kelly was hired to pilot the replacement aircraft to Colombia.

Testimony also indicated that Cepeda was the contact for members of the conspiracy for information regarding the seizure of the plane and the arrest of the crew. Martinez telephoned Cepeda upon his arrival in Texas on the eve of the plane's scheduled return from Colombia, and she informed him that the others were already at the designated landing strip.[2] The day after her plane's scheduled return, Cepeda conveyed a message to Martinez from Colombia that the plane had been

---

**1.** Fortna was named in all but one count.

**2.** The failure of Cepeda to be present at the time that the marijuana was expected to arrive is not a circumstance that supports a hypothesis of innocence. If, as the evidence indicated, Cepeda provided the connection between the smugglers and the Colombian suppliers, her role when the airplane made its hoped-for round trip to Colombia would understandably be to remain where the Colombian exporters could make contact and keep the American-based participants aware of the airplane's progress. That responsibility could only have been carried out in Miami, Cepeda's home.

seized when it landed at the wrong location. Cepeda informed Kelly of the loss of the plane and the arrest of the crew in detail. She indicated that it would cost her $35,000 for each crew member's release. During this conversation, she gave Pearson $5,000.00 to lease an aircraft for a flight to Colombia.

It is well settled that participation in a conspiracy need not be proved by direct evidence; it may be inferred from the actions of the accused or by circumstantial evidence of a scheme. *United States v. Carter,* 760 F.2d 1568, 1582 (11th Cir.1985); *United States v. Cole,* 755 F.2d 748, 755 (11th Cir.1985). The evidence of Cepeda's conduct recited above, although circumstantial, easily affords a sufficient basis for finding that she deliberately and knowingly joined and participated in the conspiracy. *See Cole,* 755 F.2d at 754.

### B. *Bowles' Involvement*

■ Bowles challenges the sufficiency of the evidence supporting his conviction on Count II for conspiracy to import marijuana into the United States. He does not challenge his conviction on Count III.

Bowles' argument that the evidence shows conduct that at worst is suspicious, and that indicates mere presence or association, is fatuous. The fact that his acts appeared not to be illegal when viewed in isolation does not bar his conviction. "An act innocent in nature and of no danger to the victim or society suffices if it furthers the criminal venture." *United States v. Jones,* 642 F.2d 909, 914 (5th Cir.1981). Moreover, the totality of the circumstances compels the conclusion that Bowles was a knowing participant in the importation conspiracy. *United States v. Fernandez,* 797 F.2d 943, 949 n. 3 (11th Cir.1986).

Bowles participated in organizational activities in Florida, Aruba, and California that concerned aircraft intended solely for use in the effectuation of the importation plan. Testimony indicated that Bowles was brought to his first meeting in Florida by principal conspirators Fortna and LaChance. Present at that meeting was a Colombian whose express role was to guide the airplane to the marijuana pickup site in Colombia. Bowles was identified as a flight navigator. The specific details of the importation venture were discussed at that meeting. Bowles accompanied Kelly[3] to Aruba to inspect the DC-7 that had been impounded by Aruban authorities, even though he was not qualified to navigate a DC-7. The trip to Aruba was paid for by the conspirators. While in Aruba Bowles learned what was necessary to obtain access to the impounded airplane. Bowles returned to the United States with Kelly and Reece. Bowles went to California only a couple of weeks after his return to Florida and met with Hernandez, a principal conspirator who had not attended the Florida meeting. Bowles' assignment that time was to assist Kelly and Pearson in checking the airworthiness of a KC-97 tanker that the conspirators hoped to lease for their venture. Bowles went to an airport with Hernandez, Kelly and Pearson where the KC-97 was parked and examined the aircraft. Efforts to lease the KC-97 collapsed, and Bowles thereafter accompanied Kelly, Pearson, Hernandez and Fortna to another airport, where Kelly and Pearson tested a DC-7. Bowles later attended the meeting with Martinez, Fortna, Hernandez and Pearson at which Martinez revealed that Cepeda had provided $40,000 to lease the DC-7.

Bowles' conduct cannot be regarded as innocent when examined in context. Bowles was present at places where nonparticipants in the smuggling venture would have not been invited. He was not present merely on an isolated occasion; rather, he attended multiple planning meetings, and was not heard to have protested that he was not a part of the illicit scheme that was the obvious topic of discussion. *See United States v. Kincade,* 714 F.2d 1064, 1065 (11th Cir.1983). This evidence affords a sufficient basis from which the

---

**3.** Bowles was unaware that Kelly was cooperating with law enforcement officials during this journey and thereafter.

jury could infer that he heard, understood, and acquiesced in the statements. *Carter,* 760 F.2d 1568, 1579.

## II. *THE DENIAL OF THE MOTION FOR SEVERANCE*

The trial of Cepeda, LaChance, and Bowles began with three others joined as defendants, William Jeske, James Harnage, and Albert Fortna. A mistrial was declared as to Fortna one week into the trial because a cancer detected in his lawyer's arm prevented his continued participation in the case. Jeske was subsequently severed before any evidence incriminating him was adduced. The trial continued to conclusion with the four remaining defendants. All three appellants argue that the district court erred in denying their motions for severance. Each sought severance on diverse grounds including a spill-over effect of testimony relating to Fortna's activities, comments by counsel on the testimony of co-defendants, comments made by Bowles in his *pro se* closing argument, and the court's instructions bearing upon all of these alleged errors.

### A. *Governing Principles*

■ Persons charged together should be tried together. *United States v. Butler,* 792 F.2d 1528, 1534 (11th Cir.1986). However, Rule 14 of the Federal Rules of Civil Procedure provides that a court may in its discretion order a severance of defendants to avoid prejudice resulting from the joinder. *See United States v. Taylor,* 792 F.2d 1019, 1023 (11th Cir.1986). A defendant must demonstrate specific and compelling prejudice to justify reversal of a denial of severance. *United States v. Meester,* 762 F.2d 867, 883 (11th Cir.1985). The standard for determining compelling prejudice is whether the jury could compare and estimate the independent evidence against each defendant on each count and thereupon reach individual verdicts. *United States v. Pirolli,* 742 F.2d 1382, 1386 (11th Cir.1984); *United States v. Garrett,* 727 F.2d 1003, 1014 (11th Cir.1984); *United States v. Phillips,* 664 F.2d 971, 1017 (5th Cir.1981).

■ In addition, cautionary instructions limit the effect of evidence which might otherwise be prejudicial. *Meester,* 762 F.2d at 884. Where there is no reasonable basis to conclude that the jury did not have the capacity to follow these instructions and make the required judgments as to guilt on each count and each defendant, there is no basis for severance. *United States v. Rivera,* 775 F.2d 1559, 1564 (11th Cir.1985), *Meester,* 762 F.2d at 884.

When the record is considered in light of these principals, we find no error in the district court's denial of severance.

### B. *Comments by Cepeda's Counsel During Final Argument*

■ LaChance did not testify at the trial. He argues that the district court erred in refusing to grant a mistrial as to him on grounds that counsel for Cepeda, who did testify, commented upon his right to remain silent during the closing argument. Counsel for Cepeda told the jury that "you had better be clean up there when you take the stand because if you're not, Mr. Kennedy (the prosecutor) will have her in his hand." Transcript at 1658. No objection was made when the comment occurred. LaChance moved for a mistrial only after the closing charge had been given by the court and contended that the remark by counsel for Cepeda constituted a "side slap at those who have not taken the stand" and an impermissible reference to his client's failure to testify. Transcript at 1695. No other relief was thereafter requested.

In *United States v. Diecidue,* 603 F.2d 535, 553 (5th Cir.1979), the court distinguished between an adverse reference to an accused's silence by counsel for a testifying co-defendant, which is improper, and a favorable observation by that lawyer on the willingness of his own client to testify, which, we hold, is permissible. The court found no error where counsel "made no reference to the silence of other defendants but merely observed that [his own client] had told his story under oath, subject to cross-examination and before the scrutiny

of the jury." *Compare DeLuna v. United States*, 308 F.2d 140 (5th Cir.1962), in which a co-defendant's attorney's direct comment on the failure of another accused to testify constituted reversible error.

We see no significant difference between the remarks in *Diecidue* and those of Cepeda's lawyer, and we hold that the comment was not error. *See also United States v. Vera*, 701 F.2d 1349, 1362 (11th Cir.1983); *United States v. Washington*, 550 F.2d 320, 328 (5th Cir.1977); *United States v. Hodges*, 502 F.2d 586 (5th Cir.1974).

We note further that the court in its final instructions instructed the jury that the government bore the burden of proving guilt beyond a reasonable doubt. It also admonished the jury that "if a defendant elects not to testify, you should not consider this in any way during your deliberations." This language afforded LaChance the protection to which he was entitled.

### C. *Comments by Bowles During Final Argument*

■ LaChance and Cepeda argue that the district court erred in not granting a mistrial as to them on grounds that Bowles, in his *pro se* closing argument, improperly vouched for the credibility of a government witness, argued facts not in evidence, and made inflammatory comments.

4. The court provided Bowles with a copy of the proposed jury charge, and postponed formal discharge of Bowles' counsel until the next day so that he could discuss his summation with his attorney. The court admonished Bowles not to testify during closing argument, and warned him that if he violated this directive twice, the jury would be instructed that the comments were not evidence and that Bowles had foregone his opportunity to testify. Transcript at 1520.

5. Bowles challenged the credibility of government witness Martinez. Using the first person singular, he told the jury that he did not meet Martinez in Cepeda's presence. Once more the prosecutor objected, prompting another instruction not to consider the comment as evidence. Transcript at 1594–95. Bowles continued to argue facts not testified to by witnesses under oath. When the prosecutor objected again, the court stated that the jury assuredly understood

The district court's diligent instruction of the jury throughout Bowles' *pro se* summation abrogated any prejudice which may have affected the co-defendants' verdicts. The court informed the jury that it had granted Bowles' request to present his own closing argument. Transcript at 1542–1543. The court emphasized that Bowles had been cautioned not to use the opportunity to testify on his own behalf,[4] and underscored this point by instructing them that the final arguments do not constitute evidence. Transcript at 1544. At each juncture at which Bowles made an improper comment, the court interrupted him to give the jury the appropriate cautionary instruction.[5] The court's persistence, and the lack of any basis upon which to conclude that the jury could not comprehend the court's instructions, precludes a finding of compelling prejudice warranting reversal of the district court's denial of severances for LaChance and Cepeda.

### 1. *The Court's Instruction About Bowles' Opportunity to Testify*

■ LaChance further argues that the court's reference to Bowles' failure to testify in an instruction given to the jury during his closing argument impermissibly commented upon LaChance's right not to testify. However, it is clear that this admonition referred to Bowles alone.

that the comments could not be considered as evidence. Transcript at 1596. Bowles continued his argument, saying that government witness Kelly was truthful when he "said that all agents from law enforcement was liars, and the FBI was the greatest of them all." Transcript at 1597. Bowles continued discussing proof related to a different count. He told the jury about "gangsters" who carried "guns and things like that," making particular reference to prosecution witness Gilbert Knerr, whom he called "a known gangster and a dope addict." Transcript at 1598. The court held a sidebar conference. As a result, Bowles clarified this argument, telling the jury that he was referring only to Fortna and Knerr, and not to any of the co-defendants on trial. Transcript at 1602. He proceeded to the end without further interruption, telling the jury curiously, "I'm not looking for justice. I'm looking for you to find me not guilty." Transcript at 1604.

Following two comments made by Bowles,[6] the court addressed the jury as follows:

I have told Mr. Bowles earlier—and this is a difficult situation. This is not usual, ladies and gentlemen, and now I'll tell you that he had an opportunity to testify under oath where he could have been cross-examined by the prosecution. He chose not to do that, and therefore, anything he says is not evidence in the case. It's not sworn testimony.

Transcript at 1593.

This comment merely placed Bowles' argument in perspective by noting that its substance was not to be taken as evidence. It did not comment upon Bowles' right to remain silent or, by implication, LaChance's right to do so. *Cf. Diecidue,* 603 F.2d at 553.

### D. *The Denial of Bowles' Motion for Severance*

█ Bowles argues that his case should have been severed upon severance of that of Fortna, so that the prejudice resulting from his being tried jointly with Harnage would have been avoided. Bowles' argument rests on the premise that evidence adduced at the joint trial that related only to counts against Harnage reduced his chances of acquittal and thereby prejudiced his case.[7]

Bowles must demonstrate he suffered compelling prejudice as a result of the joint trial. *See Priolli,* 742 at 1386; *Garrett,* 727 F.2d at 1014; and *Phillips,* 664 F.2d at 1017. Specifically, he must show compelling prejudice caused by the alleged evidentiary spillover, which effectively precluded the jury's ability to make the necessary individualized determination. *Johnson,* 713 F.2d at 640. Bowles cannot point to anything in the record indicating that the jury was confused about the evidence

against him, or that the jury decided to hold him responsible for offenses committed by co-defendants. Nor can we find a basis in the record to conclude that the jury was unable to, or failed to, comply with the court's unequivocal instructions during and at the close of trial, that the jury was to consider each defendant and each count separately.

### III. *THE THREAT MADE BY LA-CHANCE*

LaChance argues that the district court erred in admitting evidence of a statement uttered by LaChance in which he threatened that "he was going to blow away or kill" a co-conspirator. LaChance argues, as evidence of his involvement in the conspiracy, that the statement constituted cumulative evidence, and that therefore its probative value is outweighed by prejudice inherent in a remark which paints him as a "cold blooded killer."

█ Rule 403 of the Federal Rules of Evidence provides for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of *unfair* prejudice. *Fed.R.Evid.* 403. (Emphasis added). Evidentiary rulings under Rule 403 are committed to the broad discretion of the court, and are subject to reversal only upon a showing of abuse of discretion. *Meester,* 762 F.2d at 875.

█ LaChance does not argue with the relevance of the statement. It was probative of his knowledge of the plan, his supervisory role in court, and his association and relationship with his co-conspirators. Absent a finding of unfair prejudice, the statement would therefore be admissible. *United States v. King,* 713 F.2d 627, 631 (11th Cir.1983).

We do not find any indication of prejudice in the record. The statement did not

6. Bowles informed the jury that he had been a pilot for 40 years, and that he had a disability. Following a cautionary instruction in which the court told the jury that the statement did not constitute evidence, Bowles continued by telling the jury that he did not care to be out in the streets "getting killed by gangsters and liars like has been on this stand today." The court admonished the jury that the argument was im-

proper, and warned Bowles about the impropriety of his conduct. Transcript at 1592–93.

7. Bowles also incorporates by reference the arguments of LaChance and Cepeda for severance. Our reasons for affirming the denial of their severance motions applies with equal force here. *See supra,* pp. 1495–96.

receive special emphasis at any point in the proceedings. It .was admitted two weeks prior to the start of the jury's deliberations, and was not expressly referred to again until, interestingly, counsel for the LaChance referred to it in closing argument. The record does not indicate circumstances in which the jury would be substantially influenced by the remark so as to cause unfair prejudice to LaChance. *Meester*, 762 F.2d at 876. We conclude that the district court did not abuse its discretion in admitting this evidence.

## IV. *THE HYBRID REPRESENTATION CLAIM AND COMMENT BY THE COURT*

Bowles argues that the district court's refusal to permit him to retain his attorney in an advisory capacity during closing argument constituted reversible error under the Fifth and Sixth Amendments and contributed to his amateurish performance.

 It is the law of this circuit that the right to counsel and the right to proceed *pro se* exist in the alternative and the decision to permit a defendant to proceed in a hybrid fashion rests in the sound discretion of the trial court. *United States v. Mills*, 704 F.2d 1553, 1557 (11th Cir.1983); *United States v. Daniels*, 572 F.2d 535, 540 (5th Cir.1978). Where hybrid representation is denied, and the defendant elects to proceed *pro se*, it is the duty of the reviewing court to make sure that the choice was made knowingly, intelligently, and voluntarily. *United States v. Shea*, 508 F.2d 82, 86 (5th Cir.1975). In *Mills*, the defendant argued that the district court abused its discretion in failing to allow hybrid representation during the trial where the discovery phase and all pretrial hearings had been conducted with hybrid representation. He argued that the court's delayed ruling on his request to proceed with a hybrid defense encouraged him to rely on the likelihood of a hybrid defense, and that his election to proceed *pro se* deprived him of the insights he might have had had he conducted his own discovery or his attorney had been beside him at counsel table. The court held that, regardless of the tacti-

cal advantages of hybrid representation, the district court's refusal to permit it did not constitute reversible error where the court made substantial accommodations to assist the defendant in *pro se* defense.

 The record clearly reflects painstaking effort on the part of the court to inform Bowles of the pitfalls of self-representation, and to discourage him from doing so. The court explicitly advised both attorney and client as to the ramifications to this decision. Upon his announcement that his client wished to proceed *pro se* and retain advisory counsel, the court informed Bowles' attorney that his client's decision was tantamount to a waiver of his right to counsel and that the court would not permit Bowles to proceed *pro se* as long as he was represented by counsel. The court addressed Bowles personally after his attorney informed the court that Bowles would discharge him if hybrid representation was not allowed and thereafter advised Bowles on more than one occasion as to the permissible limits of closing argument and the prohibition against arguing facts not in evidence. The court expressly informed Bowles that his lawyer would be discharged and unable to advise him. Transcript at 1444–46. At the request of Bowles' counsel, the court permitted Bowles and his attorney to confer overnight and did not require Bowles to announce his final decision until the following morning. Bowles subsequently announced his decision to proceed *pro se* the next day.

Clearly, Bowles' decision to proceed *pro se* was made with full knowledge of the foolhardiness that accompanied it. The fact that the denial of hybrid representation may have contributed to, by creating the opportunity for, Bowles' amateurish performance and the court's need to give cautionary instructions does not indicate abuse of discretion in denying the request here, as the district judge adequately assisted Bowles in his *pro se* effort. It is apparent that having counsel available would have required the trial judge to subject the jury to frequent interminable pauses in the summation while Bowles spoke with unofficial counsel to receive the same advice that the court gave without protracted delays in the summation. Moreover, it

has been held that where a defendant is properly permitted to appear *pro se,* his lack of legal expertise is not a basis for reversal. *United States v. Weninger,* 624 F.2d 163 (10th Cir.1980).

Bowles' final point is that the district court directly commented on his right to silence during his closing argument and therefore committed reversible error by giving the cautionary instruction also complained of by LaChance.[8]

The court simply told the jury that having elected to exercise his right not to take the stand, Bowles could not take advantage of his opportunity to make his own closing argument to introduce evidence not subject to cross-examination. Any lingering possibility that the jury might regard the court's comment as adversely reflecting upon Bowles' silence was dissipated completely by the clear admonition in the court's closing instruction that "if a defendant elects not to testify, you should not consider that in any way during your deliberations." Transcript at 1680. Accordingly, we find no basis for reversing Bowles' conviction on this ground.

WE AFFIRM.