[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11946

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JERRELLE QUINTREZ GLADDEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:20-cr-00022-CLM-JHE-1

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Jerrelle Gladden was convicted of possession with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Gladden now appeals his convictions and total sentence, arguing that: (1) the district court erred in denying his motion to suppress evidence that was the fruit of an unlawful search; (2) the district court erred in denying his motion for hybrid representation; (3) the district court abused its discretion when it did not allow Rashad Forbes to testify in Gladden's defense; (4) the trial evidence was insufficient to support Gladden's convictions; and (5) the district court erred in finding that Gladden qualified as a career offender under U.S.S.G. § 4B1.1. For the reasons below, we affirm his convictions and sentence.

## I.    BACKGROUND

In January 2020, Jerrelle Gladden was living at his grandmother's home (the "residence") at 2800 Walnut Avenue in Anniston, Alabama. On January 10, 2020, Officer Matt Thompson obtained and executed a search warrant for the residence.

When Thompson executed the warrant, Gladden was sleeping in one of the bedrooms in the residence. The search yielded marijuana, about 50 grams or more of methamphetamine, 297

Xanax bars, 84 ecstasy pills, about $1,500 in cash, drug paraphernalia, and three firearms. Except for a single baggy, all drugs recovered at the residence were found in the bedroom where Gladden was staying. Two firearms were found in a folding chair in his sister's bedroom.

To establish probable cause for the search warrant, Thompson relied on a confidential informant ("CI"). In his application for the warrant, Thompson attached a supporting affidavit, which stated the following facts. Thompson worked with the major crimes unit since February 2019 and detailed his previous experience as an investigator with the police department. He had worked on drug cases in his career, and from his experience, had learned about the drug trade business. In his belief, drug dealers often possess firearms to protect themselves, scales are commonly used to weigh drugs, and most drug dealers track their sales. He stated that "during the summer of 2019, MCU received information that the house located at 2800 Walnut Avenue [the residence] was being used to distribute illegal narcotics." Thompson also wrote the following:

> Within the past 24 hours, I have spoken with a confidential and reliable informant, who stated that within the past 72 hours he/she was at 2800 Walnut Avenue, Anniston, Alabama and witnessed a person possessing alprazolam (Xanax) inside of the residence. The pills were packaged in a clear plastic bag. . . This CI is considered reliable as his/her information and

assistance has led to the delivery of controlled substance in the past. Furthermore, the CI is familiar with alprazolam (Xanax) and the way in which it is packaged and sold for profit.

The affidavit stated that the CI had observed several firearms throughout the residence.

Gladden was later charged in a third superseding indictment with one count of possession with intent to distribute five grams of more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) (Count 1), possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 2), and one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 3).

Gladden filed a motion to suppress the items found in the search of the residence. He argued that the search was unconstitutional because there was not a sufficient basis in Thompson's affidavit to establish probable cause. He also argued that the affidavit did not mention whether the Xanax was being sold or possessed illegally or if the Xanax was still in the residence, and that the affidavit did not state that someone at the residence was legally prohibited from possessing a firearm.

As to the CI, he contended that there was only a general allegation of reliability which this Court struck down in *United States v. Foree*, 43 F.3d 1572 (11th Cir. 1995). He also argued that the good-faith exception did not apply because the affidavit was wholly lacking in facts that would support probable cause as it contained

conclusory allegations and a bare bones report about the CI. Gladden attached the affidavit and warrant application to his motion.

The government responded that the court should deny Gladden's motion. It noted that after Gladden was read his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Gladden claimed ownership of the drugs, cash, and two of the firearms. Under the totality of the circumstances, the government contended, the affidavit supplied the judge with a substantial basis for concluding that there was probable cause to search the residence. The government further argued that, even if there were no probable cause, the good-faith exception applied.

At the suppression hearing, Gladden argued that the good-faith exception should not be considered because the probable cause calculus was limited to the four corners of the affidavit. The magistrate judge responded that the law allowed it to consider things outside of the four corners of the affidavit.

The government had Thompson testify to the following. He worked for the Anniston Police Department for about seven years and on the drug task force for several years. In his experience working on drug cases, firearms were often used in connection with drug offenses. He had experience working with Xanax. When he worked in the major crimes unit he worked on possession, distribution, and drug trafficking cases. He had worked with about 50 CIs. He had become familiar with the day-to-day activities of drug dealers. He had obtained around 25 or 30 search warrants, and would usually go to Judge Lacher, who signed the

6                  Opinion of the Court              23-11946

warrant in Gladden's case, due to her availability. Judge Lacher did not amend the affidavit to include any additional information before she signed it.

Thompson explained that he relayed to Judge Lacher what the CI had told him: that a person who went by JG who was from out of town was buying and selling firearms at the residence. Since JG was from out of town, Thompson expedited the investigation and asked the CI to go back to the residence to get more information. The CI went to the residence twice and told him the night before the search warrant was executed about the drugs in the house. Thompson stated in the affidavit that the CI told him the information within the past 72 hours to protect the CI's identity. Thompson executed the warrant on the same day he obtained it. Judge Lacher did not question him about the freshness of the information, but she was aware that the information was fresh. Based on Thompson's training and experience, pills that were packaged in a clear bag indicated that those drugs were being sold illegally. Xanax can be a prescribed medication, and because the CI viewed the Xanax in plastic bags, that led Thompson to believe it was packaged for resale or possessed illegally. He wrote in the affidavit that the CI was familiar with Xanax and the way it was packaged and sold because the CI was active in the illegal drug trade and had experience with controlled buys. He wrote that the CI saw firearms in the house, and that based on Thompson's experience, those who possess and distribute drugs often keep firearms nearby to fend away robbers. He did not believe that he had a conversation with Judge Lacher about the CI's basis of knowledge beyond

what was in the affidavit. Outside of the affidavit, Thompson told Judge Lacher that the residence was one that his unit had dealt with before, because they executed search warrants there before, where they recovered firearms and drugs. Before the CI had given him the information, his unit had received information in the months before that the house was used to sell drugs from. Javarius Gladden was the target of the previous search warrant during which they recovered firearms and drugs. He did not know who Jerrelle Gladden was before the current search warrant and no controlled buys were executed within 72 hours of obtaining the search warrant at issue.

Thompson believed that there was probable cause to obtain the search warrant because the CI was reliable, the information was provided within 24 hours, the CI went into great detail, and Thompson had been to the house before because it was known to be a place where drugs were distributed. The CI did not tell him where the Xanax was in the home or who was in the home. All the previous warrants for the home were valid and he had no reason to believe that the warrant was invalid.

Gladden filed a motion for a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154 (1978). He argued that Thompson's testimony did not include the fact that his CI previously provided wrong information. He contended that Thompson recklessly omitted facts, including that the CI did not see any scales or evidence that drugs were being sold and packaged, which Gladden argued showed that the affidavit did not contain sufficient statements

to support a finding of probable cause. He also pointed to alleged misstatements that Thompson made during the detention hearing. Lastly, he argued that the good-faith exception did not apply.

The government responded that the search warrant was judicially issued and thus was presumptively valid. It also argued that Gladden did not make a preliminary evidentiary showing that the information in the affidavit was knowingly or recklessly false.

The magistrate judge issued a Report and Recommendation. The report and recommendation found that most of the misstatements that Gladden cited to in his motion were unrelated to the warrant. It determined that Gladden ignored Thompson's testimony that the CI had made controlled buys of pills before and also concluded that Gladden provided no evidence that Thompson's warrant application was deliberately or recklessly false. It also found that Thompson's alleged misstatements or omission did not meet the *Franks* standard, and thus Gladden was not entitled to a hearing.

As to the motion to suppress, the magistrate judge found that the affidavit disclosed why Thompson considered the CI reliable. The magistrate judge explained that the affidavit described Thompson's training and experience, the CI's observation of the Xanax in a clear plastic bag, the CI's familiarity with how Xanax was packaged and sold for profit, and the CI's observations of firearms in the house. The magistrate judge found that taking the facts together there was probable cause, and the motion should be denied.

The report and recommendation also suggested that even if there were no probable cause, the good-faith exception applied. The magistrate judge found that Thompson's testimony that the CI had worked for that unit for over five years, provided information that led to search warrants, arrests, and prosecutions, and that Thompson himself personally conducted controlled buys with the CI, bolstered the CI's reliability. Based on Thompson's testimony and the affidavit, the magistrate judge found that it was reasonable for Thompson to believe that he had probable cause to search the residence and to have relied on Judge Lacher's issuance of the warrant. The report and recommendation also determined that Thompson did not intentionally leave out facts that would have defeated probable cause but left out facts that would have supported the issuance of the warrant. The magistrate judge ultimately recommended that the district court deny Gladden's motions.

Gladden then filed objections to the report and recommendation, but the district court adopted the report and recommendation and overruled Gladden's objections. The district court found that Thompson's affidavit described the following: his training and experience with drug dealers and firearms, that the CI observed Xanax packaged in a clear plastic bag, that the CI was familiar with how dealers package pills, and that the CI observed firearms in the house. It found that the affidavit gave Judge Lacher a basis to conclude that the CI was reliable in providing information that led to the delivery of controlled substances in the past and that the affidavit therefore provided probable cause. The district court agreed

with the magistrate judge that while owning guns or having prescription pills on its own can be innocent, those actions taken together supported probable cause.

The district court further found that Thompson's testimony did not suggest that he made material omissions about the CI's reliability because the testimony about the CI's reliability was not material to determining probable cause and was not done out of bad faith. It determined that Gladden did not argue that a *Franks* hearing was warranted based on the omission that drugs had not been previously seized at the residence, and that Gladden did not show that those omissions were material to finding probable cause. The district court concluded that the affidavit included enough detail to justify the search as it described what the CI saw and why Thompson believed he would find illegal drug activity at the residence. It also determined that Judge Lacher followed her normal process for issuing warrants and independently reviewed the facts before she signed the warrant, and thus did not serve as a rubber stamp for Thompson. The court agreed that the magistrate judge properly considered information outside of the affidavit. Finally, it found that Gladden failed to show that Thompson's assumption about the CI's familiarity with Xanax would show that probable cause was lacking or that his omission was reckless. Therefore, the district court denied Gladden's motions.

Gladden filed a *pro se* motion to proceed in a hybrid style defense. The government opposed the motion. Gladden requested that he have joint control of his defense and argued that he

had agreed to substantial participation by his counsel and insisted that his counsel assist him in presenting, examining, and cross-examining witnesses. He stated that without his counsel he would be unable to accomplish anything. Ultimately, he asserted that he did not want to abandon either his right to representation or his right to self-representation.

At a motions hearing, the district court informed Gladden that hybrid defense was not something that the court did and that it was up to Gladden whether he wanted to proceed with counsel. Gladden responded that he did not want to waive his right to a fair trial and that he wanted to proceed with counsel but wanted to have his voice heard. The district court preserved his objection, but later denied Gladden's motion to present a hybrid defense after it found that Gladden had stated that he would like to retain his counsel.

Turning to the trial, Gladden stated that he would have Rashad Forbes, who was currently in federal custody for distribution of methamphetamine, testify in his defense. He stated that Forbes was his cousin and lived at the residence. Gladden planned to ask Forbes about Forbes's familiarity with the residence. Forbes's counsel stated that Forbes might assert his Fifth Amendment right to be free of self-incrimination but Gladden believed that the testimony that he sought to elicit did not implicate the Fifth. The district court stated that as long as there were some questions that did not implicate the Fifth it had no problem with Forbes testifying.

On direct examination, Thompson testified to the following. When they entered the room that he labeled as Gladden's, they found a trash bag that had within it several bags which contained methamphetamine. On top of the bag was a jacket which had a wallet that had two of Gladden's drivers licenses. There were also small bags tucked into the wallet. After his interview with Gladden, he decided not to test the items for DNA. In another room, that Thompson labeled as Mikkitta Gladden's room, officers found a couple of firearms, pistols, a brown bag, and a digital scale. The bag contained about $1,500 in cash. There was a magazine with ammunition in the pistol. The crime lab found nothing on the firearms. Gladden's grandmother owned the residence, but Thompson determined that Gladden was living there at the time, and that the grandchildren would come and go from the home. Gladden explained in his interview with Thompson that he was in town visiting and referenced the room he was found in as his room. Thompson stated that he would not have charged Gladden had he thought that the evidence was possessed by someone else, which was why Gladden was not charged with the firearms found in his grandmother's room.

Through Thompson's testimony, the government entered into evidence the audio of Gladden's interview with Thompson during which the following occurred. Thompson read Gladden his Miranda rights. Gladden responded that he understood his rights and began to speak with Thompson. Thompson told Gladden that officers found Xanax, methamphetamine, and Gladden's licenses. Thompson stated that in Gladden's sister's room they found

money, methamphetamine, and at least one firearm. Gladden asked if the money that was found next to the methamphetamine and guns was in a brown bag and Thompson replied that it was. Gladden admitted that the money found in that bag was his money. He stated that he had a prescription for the Xanax, and that he used methamphetamine. Gladden said that none of the stuff found was the women's who were also in the home.

Outside the presence of the jury, Gladden informed the district court that he would call Forbes who planned to invoke the Fifth Amendment. The district court then asked Forbes's counsel what her client would answer to, which she replied that he would only answer the question: "what is your name." The district court stated that the Eleventh Circuit has held that if it was apparent that the witness will not answer questions and intended to invoke the Fifth for his entire testimony, that it cannot put the witness in front of the jury. The district court asked Gladden if he preferred that Forbes proffer what his testimony would be outside the jury's presence or accept Forbes's counsel's word that he would not testify to anything beyond his name. Gladden responded that the court could inform Forbes that he was only asking basic questions and nothing that would incriminate Forbes. Forbes's counsel stated that he was concerned about what the government might cross-examine Forbes about. Gladden stated that he wanted to ask Forbes what he was incarcerated for and what his relationship to Gladden's grandmother was. The government responded that based on those questions, its cross-examination would be about

Forbes's conviction and what address Forbes was living at before his incarceration.

The district court found that there were questions that Forbes would answer without invoking the Fifth Amendment, and therefore, he could be in front of the jury. The government argued that Forbes should not be able to come in front of the jury as it was extremely prejudicial. The court then asked what his point in calling Forbes was if it was not to insinuate that he was the person who the drugs belonged to. Gladden argued that he did want to insinuate that the methamphetamine was someone else's. Gladden argued that he would not explicitly say whose methamphetamine it was but wanted to show that others had access to the methamphetamine in the house. The district court responded that the jury would not hear from Forbes because the questions he wanted to ask would require Forbes to invoke the Fifth in front of the jury. The district court told Gladden to call his other witnesses first.

Later, the district court excused the jury and allowed Gladden to proffer testimony from Forbes. The court ultimately found that Forbes validly invoked the Fifth Amendment. The court asked how the probative value of Forbes's testimony outweighed "the high potential for prejudice" in having Forbes invoke the Fifth in front of the jury. Gladden argued that he could do a direct examination of Forbes without him invoking the Fifth. He argued that it was probative for the jury to see and hear Forbes and know that he was not in custody on January 10, 2020, and was currently incarcerated for distribution of methamphetamine. The court found

that there was already evidence that Forbes was in and out of the residence which meant that Forbes did not have to be put on the stand to show that he had access to the house in January 2020.

The court explained that because Forbes would not answer certain relevant questions that the probative value of his testimony was minimal compared to the prejudicial value of him being on the stand invoking the Fifth. The court determined that it would be highly prejudicial for the jury to draw any inference from Forbes invoking the Fifth. It found that the fact that Forbes was convicted of distributing methamphetamine post-January 2020 to not be so probative to overcome the highly prejudicial inference that those were Forbes's drugs and guns. Therefore, the court found that Forbes was not allowed to testify. The court then recessed.

The court reconvened and Gladden made a Rule 29 motion in which he argued that there was not sufficient evidence that he knowingly possessed the firearms or drugs.

The court denied the motion. Gladden argued that he did not admit to possessing methamphetamine to which the court replied that it did not base its ruling on that statement. The jury was brought in and Gladden rested. The parties presented their closing arguments. Gladden renewed his Rule 29 motion which the court denied.

During deliberations, the jury asked whether Forbes was in prison in January 2020. Gladden asked that the court tell them that he was not, but the court responded that the jury did not hear that evidence. The court stated that the response should be that the

jury was limited to the evidence presented. Gladden responded that his grandmother testified that Forbes was not in custody in January 2020. The court stated that it was not going to read the jury testimony and stated it would give the response that the jury was limited to the evidence it heard. Gladden noted his objection. The court called in the jury and told the jury that it should consider the evidence admitted in the case. The jury was excused. Gladden renewed his Rule 29 motion. The jury found Gladden guilty on all three counts. Gladden renewed his Rule 29 motion and the court overruled it.

The district court found after a hearing on the matter, that a sentencing enhancement pursuant to 21 U.S.C. § 851 applied to Gladden.

A probation officer reported in the presentence investigation report (the "PSI") Gladden's conduct as outlined in his trial. The officer then calculated Gladden's guidelines range. The officer excluded Count 2 from his calculations because Count 2 required a mandatory consecutive sentence. For Counts 1 and 3, the base offense level was 28 under U.S.S.G. § 2D1.1 because the offense involved 49.01 grams of actual methamphetamine. Therefore, the total offense level was 28.

The officer applied a career offender enhancement as it found that Gladden was a career offender because he was convicted in Calhoun County Circuit Court in January 2005 of distribution of a controlled substance and was convicted in April 2007 of

possession of marijuana which were both felony convictions for controlled substance offenses.

The officer also determined that Gladden was an armed career criminal because he was convicted in Calhoun County Circuit Court of assault, distribution of a controlled substance, and possession of marijuana.

The officer found that Count 1 qualified Gladden as a career offender, and thus the statutory maximum was life, and the base offense level would be 37 under U.S.S.G. § 4B1.1(b)(1).  The officer found that because the offense level was 37 without a reduction for acceptance of responsibility and Gladden's criminal history category was VI, his guidelines range was 360 months to life.  The officer noted that because of Count 2 and the minimum consecutive penalty required by 18 U.S.C. § 924(c), his guidelines range would be 420 months to life.  The officer found that the court under § 4B1.1 must use the range with the highest minimum term of imprisonment which would be 420 months to life.

Gladden's criminal history was calculated to be VI because he was a career offender.  Due to Gladden being a career offender his total offense level was 37, and thus his guidelines range was 360 months to life plus 60 months consecutive for Count 2.

Gladden filed objections to the PSI, in which he argued, among other things, that he should not receive a chapter four enhancement for being a career offender.

The government responded that it was not seeking an armed career criminal enhancement.  It argued that Gladden's

convictions for unlawful distribution of a controlled substance and unlawful possession of marijuana qualified him as a career offender.

In his sentencing memorandum, Gladden argued that the probation officer incorrectly added the minimum punishment required for Count 2 to the alternative guidelines range determined under § 4B1.1(c)(3). He argued that the applicable guidelines range was 140 to 175 months. He claimed that his previous cocaine conviction was double counted because his cocaine conviction established the § 851 enhancement and was also used to support a career offender enhancement. He also contended that his marijuana conviction should not be counted because possessing marijuana was no longer a crime in other states, and although it remained criminal in Alabama, he argued that he should not be treated differently than defendants in other states.

At his sentencing, the court asked Gladden if he acknowledged that his possession of marijuana conviction counted for the career offender enhancement but that his argument was that it was unfair because most states do not consider that a felony. Gladden agreed that was his argument. The court found that it was allowed to count the marijuana conviction under the guidelines, and thus that objection was overruled because it was still a felony under Alabama law. The court found that the offense level was 37 and the criminal history category was VI. The government entered a certified copy of Gladden's possession of marijuana conviction. Gladden argued that the PSI impermissibly double counted his cocaine

conviction to establish the § 851 enhancement and career offender enhancement, but the court overruled his objection. Gladden then allocuted.

The district court overruled all of Gladden's other objections and found that Gladden was a career offender. The district court found that the guidelines range was 360 months to life for Counts 1 and 3 with an additional mandatory 60 months for Count 2. The district court sentenced Gladden to 270 months for Counts 1 and 3 followed by 60 months for Count 2 followed by 8 years of supervised release for Count 1, 5 years for Count 2, and 3 years for Count 3. This timely appealed ensued.

## II.    DISCUSSION

On appeal, Gladden argues that: (1) the district court erred in denying his motion to suppress evidence that was the fruit of an unlawful search; (2) the district court erred in denying his motion for hybrid representation; (3) the district court abused its discretion when it did not allow Rashad Forbes to testify in Gladden's defense; (4) the trial evidence was insufficient to support Gladden's convictions; and (5) the district court erred in finding that Gladden qualified as a career offender under U.S.S.G. § 4B1.1. We address each of his challenges in turn.

### A. The Motion to Suppress

First, Gladden argues that the district court erred when it denied his motion to suppress the evidence from the search of the residence because the affidavit in the warrant application failed to

establish probable cause and the good-faith exception does not apply.

In considering a motion to suppress, we apply the clearly erroneous standard to the district court's findings of fact and review the application of law to those facts *de novo*. *United States v. Jimenez*, 224 F.3d 1243, 1247 (11th Cir. 2000). We review whether an affidavit established probable cause *de novo*. *Id*. at 1248. We review *de novo* whether the good-faith exception to the warrant requirement rule applies to a particular case. *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002). When considering a ruling on a motion to suppress, "all facts are construed in the light most favorable to the prevailing party below." *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000). The Fourth Amendment provides for the right to be free from unreasonable searches and seizures, and mandates that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "To obtain a warrant, police must establish probable cause to conclude that there is a fair probability that contraband or evidence will be found in a particular place." *United States v. Gibson*, 708 F.3d 1256, 1278 (11th Cir. 2013). The affidavit need not allege that any illegal activity occurred at the residence. *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009). But the affidavit should establish a connection between the residence and any criminal activity. *Martin*, 297 F.3d at 1314. The information in the affidavit must be "fresh," and where the information comes from an informant, the affidavit must also demonstrate the informant's veracity and basis of knowledge or that there is sufficient independent corroboration of

the informant's information. *Id.* We take care to review and "to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Jimenez*, 224 F.3d at 1248. We give "great deference" to the determination of probable cause by a lower court judge. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).

Affidavits supporting search warrants are presumptively valid, and a defendant is not entitled to an evidentiary hearing unless he makes a substantial preliminary showing. *See Franks*, 438 U.S. at 171. He must allege with specificity that (1) the affiant made false statements; (2) the false statements were made either intentionally or with reckless disregard for the truth, not mere negligence or mistake; and (3) the false statements were necessary to the finding of probable cause. *Id.* at 171-72. The defendant's allegations must be accompanied by a statement of reasons and affidavits or otherwise reliable statements of witnesses, or an explanation for their absence. *Id.* at 171. Material omissions, like material falsehoods, may give rise to entitlement to a *Franks* hearing. *Madiwale v. Savaiko*, 117 F.3d 1321, 1326-27 (11th Cir. 1997).

An informant's veracity, reliability, and "bases of knowledge" are relevant considerations in the totality-of-the-circumstances analysis and do not operate independently. *Brundidge*, 170 F.3d at 1352-53. A deficiency in one may be compensated for by a strong showing as to the other. *Id.* "However, 'when there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the

informant.'" *Martin*, 297 F.3d at 1314 (alteration adopted) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)). Independent corroboration can include "creating circumstances under which [the informant] is unlikely to lie." *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995). In *Foree*, we held that the affidavit was only entitled to slight weight because the affidavit made a "bald assertion that [the CI] is a reliable informant, it still leaves the nature of that [past] performance undisclosed, so that the judicial officer making the probable cause determination has no basis for judging whether the [affiant's] characterization of [the CI's past] performance is justified." *Id*. at 1575-76.

Courts generally should not render inadmissible evidence that was obtained by police officers acting in reasonable reliance on a search warrant later found to be unsupported by probable cause. *United States v. Leon*, 468 U.S. 897, 922 (1984). In making this determination, "all of the circumstances . . . may be considered." *Id*. at 922 n.23. The good-faith exception, however, does not apply in "four limited sets of circumstances." *Martin*, 297 F.3d at 1313. These four circumstances are:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in [*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979)]; (3) where the affidavit supporting the warrant is so lacking indicia of probable cause as to render official belief in its

existence entirely unreasonable; and (4) where, depending on the circumstances of the particular case, a warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

*Id.*

Here, we conclude that the court did not err in denying Gladden's motion to suppress because the search warrant affidavit established probable cause. The affidavit stated that Thompson spoke to a CI, who, within the past 72 hours, had witnessed someone with Xanax in a clear plastic bag inside the residence and that there were firearms in the residence. The report and recommendation, which the district court adopted, properly noted that the affidavit sufficiently described Thompson's training and experience, the CI's observation of the Xanax in a clear plastic bag, the CI's familiarity with how Xanax was packaged and sold for profit, and the CI's observations of firearms in the house. The district court did not err when it found that while having firearms or prescription drugs on its own can be innocent conduct, that taken together those actions support probable cause to search the residence for possible evidence of drug dealing.

Even if the district court erred in finding that the affidavit established probable cause, it did not err in denying the motion to suppress because the *Leon* "good faith" exception applies in this case. Thompson executed the search warrant with reasonable reliance on the sufficiency of the warrant. *Leon*, 468 U.S. at 922. Of the four limited circumstance exceptions, the third circumstance

regarding the warrant being "so lacking indicia of probable cause as to render official belief in its existence entirely unreasonable" is arguably the most applicable in this situation. *See id*. But based on Thompson's testimony of his own personal history working with the CI, we conclude that the court did not err in finding that Thompson acted in reasonable reliance on the search warrant. Additionally, there was no evidence that the judge who issued the search warrant participated in the warrant process beyond reviewing the application and authorizing the search. As a result, Thompson could have reasonably believed the warrant was supported by probable cause and the good-faith exception of *Leon* would apply even if the district court erred in finding the affidavit established probable cause.

We also conclude that the district court did not err when it denied Gladden a *Franks* hearing because Gladden failed to make a substantial preliminary showing that Thompson's statements were false or that he made those statements intentionally or with reckless disregard. *Franks*, 438 U.S. at 171-72. The report and recommendation found that Thompson's testimony at the suppression hearing suggested that the CI had made controlled buys for Thompson before, but that Thompson did not intentionally or recklessly state in the affidavit that the CI was familiar with Xanax. Gladden also did not show that Thompsons's statements were necessary to the finding of probable cause because he did not show that Thompson not including that the CI's tip once led to stale information or not stating that the CI was more right than wrong was essential to the finding of probable cause. We thus conclude

that the district court thus did not err in denying Gladden's motion to suppress, and we affirm as to this issue.

### B.  The Motion for Hybrid Representation

Gladden next argues that the district court erred when it denied his motion for hybrid representation. He contends that this violated his Sixth Amendment right to self-representation because the court denied his request to participate in his own defense. He argues that he should not have been forced to waive his right to assistance of counsel to invoke his right to represent himself.

Whether a defendant waived his right to counsel is a mixed question of law and fact that is reviewed *de novo*. *See United States v. Evans*, 478 F.3d 1332, 1340 (11th Cir. 2007).

The Sixth Amendment guarantees the right to counsel in criminal trials. *Faretta v. California*, 422 U.S. 806, 807 (1975). The right to self-representation is another constitutional right closely tied to the right to representation by counsel. *United States v. Garey*, 540 F.3d 1253, 1262-63 (11th Cir. 2008) (en banc). Thus, a criminal defendant may waive his right to counsel if he does so knowingly and intelligently, and although "he may conduct his own defense ultimately to his own detriment, his choice must be honored. *Faretta*, 422 U.S. at 834. Once a defendant waives his right to counsel, a district court may, at its discretion, allow a defendant to proceed with "hybrid representation" or standby counsel. *United States v. LaChance*, 817 F.2d 1491, 1498 (11th Cir. 1987). But we have repeatedly held that there is no right to hybrid representation. *Cross v. United States*, 893 F.2d 1287, 1291-92 (11th Cir. 1990).

Here, we conclude that the district court did not err when it denied Gladden's motion for hybrid representation. First, Gladden never waived his right to counsel in the first place. Rather, Gladden sought to proceed with a hybrid defense that, by his own admission, required the assistance of counsel. In fact, at the hearing on Gladden's motion for hybrid representation, Gladden stated on record that he wanted to retain his counsel. As such, this was not a situation where the district court needed to determine whether a pro se defendant was entitled to standby counsel, because Gladden was always represented by counsel. And because there is no right to hybrid representation, the district court did not err by denying Gladden's motion. *See Cross*, 893 F.2d at 1291-92. We thus affirm as to this issue.

## C. Rashad Forbes's Testimony

We review a district court's decision to honor a witness's invocation of his Fifth Amendment right against self-incrimination for an abuse of discretion. *United States v. Perez*, 661 F.3d 568, 580 (11th Cir. 2011).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In addition to applying to a witness at a trial in which the witness is the defendant, the privilege can be asserted in any proceeding where the witness's answers might incriminate him in future criminal proceedings. *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). Although a defendant has a Sixth Amendment right to compulsory process to obtain favorable testimony, a valid

assertion of a witness's Fifth Amendment rights justifies a refusal to testify despite the defendant's Sixth Amendment rights. *United States v. Goodwin*, 625 F.2d 693, 700 (5th Cir. 1980). A violation of a defendant's Sixth Amendment right to call witnesses in his favor is subject to harmless error review. *United States v. Hurn*, 368 F.3d 1359, 1362-63 (11th Cir. 2004).

We have held that a witness's privilege against self-incrimination applies only when he has reasonable cause to apprehend danger of criminal liability. *United States v. Argomaniz*, 925 F.2d 1349, 1353 (11th Cir. 1991). The privilege "must be sustained if it is not perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency to incriminate." *Goodwin*, 625 F.2d at 701.

We have stated that, in ruling on a witness's invocation of the privilege, a district court "must make a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." *Argomaniz*, 925 F.2d at 1355. While a blanket assertion of the privilege without inquiry by the court is unacceptable, a witness may be excused if the court finds that he could "legitimately refuse to answer essentially all relevant questions." *Goodwin*, 625 F.2d at 701.

Here, we conclude that the district court did not abuse its discretion when it did not allow Forbes to testify because he validly invoked his Fifth Amendment right against self-incrimination for

essentially all relevant questions. For instance, the court properly found that Forbes validly asserted his Fifth Amendment right against self-incrimination when he did not answer questions about his connection to the residence or about whether the drugs at the residence were his. While Forbes would answer basic questions such as his name, the court determined that he legitimately refused to answer essentially all relevant questions relating to the key issues at Gladden's trial. As such we conclude that the district court did not abuse its discretion when it found that Forbes's valid assertion of his Fifth Amendment right justified not letting Forbes testify despite Gladden's Sixth Amendment rights. *See Goodwin*, 625 F.2d at 700-01. We therefore affirm as to this issue.

### D. Sufficiency of the Evidence

We review *de novo* whether there was sufficient evidence to support a conviction. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). In reviewing the sufficiency of the evidence, we view the record in the light most favorable to the government, resolving all reasonable inferences in favor of the verdict. *Id.* The evidence will be sufficient to support a conviction if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* at 1284-85 (quoting *United States v. Calhoun*, 97 F.3d 518, 523 (11th Cir. 1996)).

The test for sufficiency is the same, regardless of whether the evidence is direct or circumstantial, but where the government relied on circumstantial evidence, reasonable inferences must support the conviction. *United States v. Martin*, 803 F.3d 581, 587 (11th

Cir. 2015). We will assume that the jury resolved all questions of credibility in a manner supporting the verdict. *Jiminez*, 564 F.3d at 1285. The evidence need not exclude every reasonable hypothesis of innocence for a reasonable jury to find guilt beyond a reasonable doubt. *United States v. Cruz-Valdez*, 773 F.2d 1541, 1545 (11th Cir. 1985) (en banc). Instead, the jury is free to choose among alternative, reasonable interpretations of the evidence. *Id.*

"It is well settled that possession of contraband may be constructive as well as actual and may be proven by circumstantial evidence." *United States v. Kincade*, 714 F.2d 1064, 1066 (11th Cir. 1983). To prove actual possession, the government must prove that the defendant had either physical possession of or personal dominion over the thing allegedly possessed. *United States v. Derose*, 74 F.3d 1177, 1185 (11th Cir. 1996). "Constructive possession exists when a defendant has ownership, dominion, or control over an object itself or dominion or control over the premises . . . in which the object is concealed." *United States v. Leonard*, 138 F.3d 906, 909 (11th Cir. 1998).

Here, the evidence presented at trial was sufficient to find that Gladden had possession of the drugs found in his grandmother's residence. It was reasonable for the jury to conclude that Gladden lived at his grandmother's house and had possession over the room where the drugs were found. *Leonard*, 138 F.3d at 909. First, the officers found Gladden in the bedroom where some of the drugs were found when they executed the search warrant. Second, there was evidence that officers found Gladden's two driver's

licenses, wallet, and jacket in the bedroom next to the drugs. As for the methamphetamine found in the other room, Gladden admitted in his interview with Thompson that it was his money that was found with the methamphetamine and guns. Gladden admitted that he used that spot to hide items that he did not want the kids in the house to have access to. Gladden also admitted to using methamphetamine. While there may have been other conclusions the jury could have made, it was reasonable for the jury to conclude that Gladden had dominion or control over the rooms and spaces where the drugs were found. *Derose*, 74 F.3d at 1185. Accordingly, we affirm as to this issue.

### E. The "Career Offender" Sentencing Enhancement

We review the district court's determination that a defendant qualifies as a career offender under U.S.S.G. § 4B1.1 *de novo*. *United States v. Gibson*, 434 F.3d 1234, 1243 (11th Cir. 2006). We review *de novo* whether a prior conviction is a "controlled substance offense" under the Sentencing Guidelines. *United States v. Bishop*, 940 F.3d 1242, 1253 (11th Cir. 2019). We review *de novo* a claim of double counting. *United States v. Dudley*, 463 F.3d 1221, 1226 (11th Cir. 2006).

Under the Sentencing Guidelines, a defendant whose present offense is a controlled substance offense and who has at least two prior felony convictions for either a crime of violence or a controlled substance offense qualifies as a career offender. U.S.S.G. § 4B1.1(a). The definition of "controlled substance offense" includes an offense under federal or state law, punishable by

imprisonment for a term exceeding one year, that prohibits the possession of a controlled substance with intent to distribute or dispense.  *Id.* § 4B1.2(b).

Under Alabama law, a defendant commits unlawful possession of marijuana in the first degree by possessing marijuana (a) "for other than personal use," or (b) after being convicted of certain lesser marijuana-possession offenses.  Ala. Code § 13A-12-213(a)(1)-(2).  Unlawful possession of marijuana in the first degree for other than personal use is a Class C felony.  *Id.*  A Class C felony is subject to imprisonment of "not more than 10 years or less than 1 year and 1 day."  Ala. Code § 13A-5-6(a)(3).

We analyzed Alabama's unlawful possession of marijuana in the first-degree statute in *United States v. Robinson*, 583 F.3d 1292 (11th Cir. 2009).  In *Robinson*, the defendant argued that possession for other than personal use did not necessarily indicate distribution.  *Id.* at 1295.  We determined that § 13A-12-213 covered distribution offenses and "fit[] the definition of a serious drug offense."  *Id.* at 1295-96.

Impermissible double counting "occurs only when one part of the Guidelines is applied to increase [the] defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *Dudley*, 463 F.3d at 1226-27.  We presume that "the Sentencing Commission intended separate guidelines sections to apply cumulatively, 'unless specifically directed otherwise.'" *Id.* at 1227. "Double counting a factor during sentencing is permitted if the Sentencing

Commission . . . intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing." *Id.* (alteration adopted) (quoting *United States v. Stevenson*, 68 F.3d 1292, 1294 (11th Cir. 1995)).

Section 841 of Title 21 of the United States Code makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Violations involving 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine are normally punishable by 10 years to life imprisonment plus a fine of up to $10 million. 21 U.S.C. § 841(b)(1)(A)(viii).

Under our prior precedent rule, we must follow a prior binding precedent "unless and until it is overruled by [our] [C]ourt *en banc* or by the Supreme Court." *United States v. Brown*, 342 F.3d 1245, 1246 (11th Cir. 2003) (emphasis added).

Here, we conclude that the district court did not err when it found that Gladden was a career offender. First, the court did not err when it found that his Alabama state conviction for possession of marijuana was a serious drug offense. Our precedent holds that a conviction under Alabama law, for possessing marijuana for other than personal use, fits the definition of a serious drug offense. *Robinson*, 583 F.3d at 1295-96. Second, the district court did not impermissibly double count Gladden's conviction for distribution of a controlled substance. As Gladden concedes, it was counted once under the guidelines and once for the § 851 enhancement, which is not under the guidelines. Because counting the conviction under

the § 851 enhancement did not involve applying the Guidelines, it could not have triggered a double count of the conviction under the Guidelines. *See Dudley*, 463 F.3d at 1226-27. The district court thus did not err in applying the career offender sentencing enhancement and we affirm as to this issue.

### III.    CONCLUSION

For these reasons, we affirm Gladden's convictions and sentence.

**AFFIRMED.**